2005 OK 54

**Gwendolyn Kay PARRET, Plaintiff,**

v.

**UNICCO SERVICE COMPANY, a Delaware Corporation, and Bridgestone/Firestone, Inc., d/b/a Dayton Tire, an Ohio Corporation, Defendants.**

**No. 99,883.**

Supreme Court of Oklahoma.

June 28, 2005.

Order Denying Rehearing Sept. 12, 2005.

John S. Gladd, James N. Edmonds, J. Craig Buchan, Atkinson, Haskins, Nellis, Holeman, Phipps, Brittingham & Gladd, Tulsa, Oklahoma; and G. Thorne Stallings, Jr., Stallings Law Offices, Blanchard, OK, for Plaintiff.

Robert B. Mills, Margaret K. Myers, The Mills Firm, Oklahoma City, for Defendant, UNICCO Service Company.

Michael C. Felty, Michael T. Maloan, Robyn G. Price, Foliart, Huff, Ottaway & Bottom, Oklahoma City, OK; and Linda G. Alexander, Niemeyer, Alexander, Austin & Phillips, P.C., Oklahoma City, OK, for Defendant, Bridgestone/Firestone, Inc.

COLBERT, J.

¶ 1 The electrocution death of a worker resulted in an action in the District Court for the Western District of Oklahoma. That court has certified two questions pursuant to the Revised Uniform Certification of Questions of Law Act, Okla. Stat. tit. 20, §§ 1601–1611 (2001):

1. What is the standard of intent necessary for an employee's tort claim against an employer to fall outside the protection of the Oklahoma Workers' Compensation Act? Is the standard the "true intentional tort" test, requiring deliberate specific intent to cause injury, or is the standard the "substantial certainty" test[?] *Davis v. CMS Continental Natural Gas, Inc.,* 2001 OK 33, 23 P.3d 288.

2. Whether the scope of the test for determining principal or statutory employer status under the third tier of the three-tiered test adopted in *Bradley v. Clark,* 1990 OK 73, at ¶ 6 n. 10, 804 P.2d 425, 428,

n. 10, is based upon all of the facilities owned by a hirer, including those owned in other states and/or countries, or whether it is improper to consider a private hirer's plants outside of the state of Oklahoma in determining whether the hirer was actually engaged in the contract work at the time of the accident?

In response, this Court adopts the "substantial certainty" standard and holds that in determining statutory employer status, an Oklahoma court should consider only those facilities located within the State of Oklahoma.

## FACTS

¶ 2 Pursuant to section 1604(A)(2) of title 20, the federal court has submitted "[t]he facts relevant to the question[s], showing fully the nature of the controversy out of which the question[s] arose." Those facts are repeated here verbatim.

¶ 3 On July 20, 1999, Glenn Parret, an employee of UNICCO Service Company (UNICCO), was electrocuted while replacing emergency lights at the Dayton Tire Plant owned by defendant Bridgestone/Firestone, Inc. (Bridgestone) in Oklahoma City, Oklahoma. He died as a result of his injuries two days later and his widow, plaintiff Gwendolyn Kay Parret, received workers' compensation death benefits. Bridgestone is a tire manufacturer and distributor with plants in the United States, Canada, Mexico, and Costa Rica and hired UNICCO, an independent contractor, to provide a wide range of maintenance services at its Oklahoma tire plant.

¶ 4 While the decedent was working on the emergency lights, he was approached by another UNICCO employee, who warned him not to work on the lights while they were "hot" or energized and advised him that other UNICCO employees had refused to do the work because they felt it was unsafe. The decedent responded that he would do the work he was asked to perform and would be careful when working on "hot" lights.

¶ 5 Fact disputes exist as to the level of the decedent's understanding of electricity and his experience in working on electrical circuits, controls, and lights. Although both UNICCO and Bridgestone had written poli-

cies prohibiting employees from working on energized equipment, the evidence is contested regarding whether the decedent and other UNICCO employees were required to work on the emergency light system while it was "hot," or without turning the electricity off, knowing the employees were unable to de-energize the 227 volt electrical system and that death was substantially certain to occur. The parties disagree whether UNICCO and Bridgestone's conduct rose to the level of intentional conduct sufficient to maintain an action in tort, notwithstanding the exclusive remedy provision of Oklahoma's Workers' Compensation Act.

¶ 6 Also disputed are fact issues pertinent to a determination of whether Bridgestone was a statutory or principal employer of UNICCO workers under the Workers' Compensation Act, including whether the work being performed by decedent was non-specialized and was necessary and integral to Bridgestone's operation of its tire plant. In its other plants in North America, Bridgestone performs maintenance on its equipment with its own employees and does not hire outside contractors like UNICCO for such work.

## QUESTION 1
## INTENTIONAL TORT EXCEPTION TO WORKERS' COMPENSATION EXCLUSIVITY

¶ 7 Section 11 of the Workers' Compensation Act, Okla. Stat. tit. 85, §§ 1–211 (2001), prescribes employer liability "for the disability or death of an employee resulting from an accidental injury sustained by the employee arising out of and in the course of employment, without regard to fault." Section 12 makes that liability "exclusive and in place of all other liability of the employer." This Court has long recognized, however, that in some cases "an employee who has been wilfully injured by his employer [may] ha[ve] a common law action for damages." *Roberts v. Barclay*, 369 P.2d 808, 809 (Okla.1962).

¶ 8 Oklahoma decisions involving the exception were reviewed in *Harrington v. Certified Systems, Inc.*, 2001 OK CIV APP 53, 45 P.3d 430. That review included *Thompson v. Madison Machinery Co.*, 684 P.2d 565

(Okla.Ct.Civ.App.1984), which held that "the workers' compensation statutes were designed to provide the exclusive remedy for accidental injuries sustained during the course and scope of a worker's employment [and] were not designed to shield employers or co-employees from willful, intentional or even violent conduct." *Id.* at 568. The *Harrington* court noted that, in each case reviewed, "the court decided whether the conduct of the defendant employer involved a willful or intentional injury without specifying how the court defined willful or intentional." 45 P.3d at 434. It then defined a willful or intentional injury "to involve knowing and purposeful conduct on the part of the employer to injure the employee." *Id.* at 435.

¶ 9 In that same year, a decision from this court was issued in *Davis v. CMS Continental Natural Gas, Inc.,* 2001 OK 33, 23 P.3d 288. There, this Court, consistent with *Harrington,* reaffirmed that only intentional misconduct on the part of an employer would remove a worker's injury from the exclusive remedy provision of the Workers' Compensation Act. *Davis* foreshadowed this Court's allegiance to one of two standards commonly applied to determine whether a worker's injury resulted from the "intentional" conduct of the employer. Which standard would be adopted, however, remained undecided because the employer's conduct in *Davis* was not "intentional" under either standard. *Id.* at 296. Today, precisely that issue is presented in the form of Question One: "Is the standard the 'true intentional tort' test, requiring deliberate specific intent to cause injury, or is the standard the 'substantial certainty' test?"

¶ 10 To date, some states do not recognize an intentional tort exception to workers' compensation exclusivity. 6 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 103.01 (Math.Bend.2004). Some states that do, limit the exception to instances in which the employer injures the employee deliberately and with the actual intent to cause injury. *Id.* at § 103.03 n. 1. In a few states, the exception is expressly limited to cases of intentional assault. *See* 7 Causes of Action 2d 197, § 17 at 245 (1995). But, in any jurisdiction applying the "specific

intent" standard, "unless the case involves an assault or a battery, recovery will probably be denied." 48 Am.Jur. Proof of Facts 2d 1, § 2 at 12 (1987). "Nevertheless, in recent years there has been a trend toward permitting common law suits when the injury is a result of actions the employer knew were 'substantially certain' to cause injury. About a dozen states now follow this or a similar rule." 6 Larson, at § 103.03 n. 1.

¶ 11 The first court to reject the "specific intent" standard in workers' compensation observed that it originated from very early workers' compensation decisions in Washington and Oregon which defined employer intent in the same terms applied to murder statutes. *See Mandolidis v. Elkins Indus. Inc.,* 161 W.Va. 695, 246 S.E.2d 907, 912–913 (1978). That court found "no adequate justification for adhering to the construction of a statute which is not only erroneous but which works an injustice on persons injured as a result of conduct which is so likely to produce injury or death that its performance, under all circumstances, could perhaps warrant criminal liability." *Id.* at 913. Since that time, "both courts and legislatures in a fair number of other jurisdictions have rejected the proposition that actual intent to harm is required for an employer's conduct to be actionable in tort and not protected by the exclusivity provisions of workers' compensation." *Woodson v. Rowland,* 329 N.C. 330, 407 S.E.2d 222, 230 (1991). Essential to the determination of which standard will be applied in Oklahoma, however, is an understanding of the concept of "intent" in tort law and its relationship to other standards of conduct.

## TORT LIABILITY CONTINUUM

¶ 12 In *Graham v. Keuchel,* 1993 OK 6, 847 P.2d 342, 362, this Court explained that the common law divides "*actionable tortious conduct* into (1) *negligence,* and (2) *willful acts that result in intended or unintended harm.*" In the lower tier of tortious conduct lie three levels of negligence. *Id.* These are defined by statute in Oklahoma as slight negligence, ordinary negligence, and gross negligence. *See* Okla. Stat. tit. 25, §§ 5 & 6 (2001). In the higher tier lie two distinct levels: (1)

wilful and wanton misconduct and (2) intentional misconduct. *Id.* at 362–363.

¶ 13 The level termed "wilful and wanton" misconduct, according to Professor Prosser, occupies "a penumbra of what has been called 'quasi intent'" lying between gross negligence and intentional conduct. William L. Prosser, Handbook of the Law of Torts § 34, at 184 (4th ed.1971). As *Graham* explained:

[t]he *intent* in *wilful and wanton misconduct* is *not* an *intent to cause the injury;* it is an *intent to do an act*—or the failure to do an act—in reckless disregard of the consequences and *under such circumstances that a reasonable man would know,* or have reason to know, *that such conduct would be likely to result in substantial harm to another.*

*Graham,* 847 P.2d at 362. *Graham* noted that "[w]hile 'ordinary' and 'gross' negligence differ in *degree,* 'negligence' and 'willful and wanton misconduct' differ in *kind." Id.* Thus, comparative fault in Oklahoma remains confined to negligence and not to willful and wanton misconduct or to intentional misconduct. *Id.* at 363 ("[W]hile ordinary negligence of the plaintiff may be used as a defense against gross negligence, it may not be considered as a defense against any form of conduct found to be willful and wanton or intentional.").

¶ 14 The Oklahoma Uniform Jury Instruction, which was derived from the *Graham* decision, explains:

The conduct of [Defendant] was willful and wanton if [Defendant] was either aware, or did not care, that there was a substantial and unnecessary risk that [his/her/its] conduct would cause serious injury to others. In order for the conduct to be willful and wanton, it must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to another person.

Oklahoma Uniform Jury Instructions (OUJI)(civil), No. 9.17. The instruction goes

on to describe a higher level of misconduct explaining that a "[Defendant]'s conduct was intentional if he/she desired to cause injury to [Plaintiff] or knew that such injury was substantially certain to result from [his/her] conduct."

¶ 15 The analysis in *Graham* and the definitions derived therefrom and articulated in OUJI formulate a continuum of tort liability which may be outlined as follows:

I. Negligence

A. Slight Negligence—want of great care and diligence.

B. Ordinary Negligence—want of ordinary care and diligence.

C. Gross Negligence—want of slight care and diligence.[1]

II. Willful Acts Resulting in Intended or Unintended Harm

A. Willful and Wanton Conduct

1. Unreasonable under the circumstances and

2. High probability of serious harm

B. Intentional Conduct

1. Desire to cause injury or

2. Knowledge that such injury was substantially certain to result.

This formulation of two levels of "willful acts that result in intended or unintended harm" is also found in specific areas of tort law.

¶ 16 The definition of intent in the area of infliction of emotional distress reflects this dichotomy. "[Defendant] intentionally caused emotional distress to [Plaintiff] if [he/she/it] desired to cause such distress or knew that such distress was substantially certain to result from [his/her/its] conduct." OUJI (civil) No. 20.2. A lower standard roughly equivalent to that of "willful and wanton" is also defined by that instruction. "[Defendant] recklessly caused emotional distress to [Plaintiff] if [he/she/it] knew there was a substantial probability that emotional distress to [Plaintiff] would result from [his/her/its] conduct, and [he/she/it] deliberately dis-

---

**1.** Section 5 of title 25 provides: "There are three degrees of negligence, namely, slight, ordinary and gross. The latter includes the former." Section 6 of title 25 provides: "Slight negligence consists in the want of great care and diligence; ordinary negligence in the want of ordinary care and diligence; and gross negligence in the want of slight care and diligence."

regarded that probability."[2]  *Id.* Similarly, the definition of intent applicable to the tort of interference with a contract states: "[Defendant]'s actions were intentional if [he/she /it] either desired to interfere with [Plaintiff]'s contract with [third Party], or [he/she/it] was substantially certain that his actions would interfere with the contract." OUJI (civil) No. 24.2.

¶ 17 These statements defining intent reflect the fact that

> [t]he intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm.  Rather it is an intent to bring about a result which will invade the interests of another in a way that the law will not sanction.

. . . .

> Intent, however, is broader than a desire to bring about physical results.  It must extend not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he does.

Prosser, § 8, at 31 (footnotes omitted).  These statements defining intent are mirrored in the Restatement (Second) of Torts.  "The word 'intent' is used throughout the Restatement . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."  1 Restatement (Second) of Torts § 8A (1965).  Comment (b) to that section further explains:

> All consequences which the actor desires to bring about are intended, as the word is used in this Restatement.  Intent is not, however, limited to consequences which are desired.  If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.

*Id.* Thus, an actor's conduct is intentional when the actor has the desire to cause the consequences of the act or when the actor knows the consequences are substantially certain to result from the act.  The question is whether some compelling policy requires that a different definition of "intent" be applied to the intentional tort exception to workers' compensation exclusive remedy provision.

### POLICY CONSIDERATIONS

¶ 18 This Court will look to the text of the Workers' Compensation Act, its underlying policies, and to the purposes of workers' compensation generally in applying the provisions of the Act. The balance of interests between employer and employee is the primary reason asserted in favor of retaining a "deliberate specific intent" standard for determining employer intent.  An Illinois intermediate appellate court feared that "[a]dopting the substantial-certainty standard would disturb this careful balance because of the difficulty of employing it to distinguish between accidental and nonaccidental injury." *Copass v. Illinois Power Co.,* 211 Ill.App.3d 205, 155 Ill.Dec. 600, 569 N.E.2d 1211, 1216 (1991).  No discussion of the policies underlying workers' compensation or of how a "specific intent" standard furthers those policies appears in the opinion.  It is essential that this Court delve into this discussion and lay it to rest.

¶ 19 Workers' compensation plans were enacted, beginning in 1908 and eventually in all fifty states, in response to a problem.  Industrial accidents had reached epidemic proportions while the employer's common law defenses of contributory negligence, assumption of risk, and the fellow servant doctrine generally prevented recovery by an injured worker.  At a time when most households had only one breadwinner, a worker's injury could leave an entire family destitute.  Workers' compensation was designed to

---

2.  As Professor Prosser explains:
    to this area ["quasi intent"] the words "wilful," "wanton," or "reckless," are customarily applied; and sometimes, in a single sentence, all three.  Although efforts have been made to distinguish them, in practice all such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit.  They have been grouped together as an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care.
    Prosser, § 34, at 184 (footnote omitted).

avoid destitution. It "was passed for the special benefit of injured work[ers]. The Legislature intended the benefits of the act shall flow to the injured work[ers] and their dependents, in order to afford them a living and prevent them from becoming public charges." *Corbin v. Wilkinson*, 175 Okla. 247, 52 P.2d 45, 48 (1935). Workers' compensation is a mechanism for providing wage benefits and medical care to injured workers and spreading the cost of these benefits through insurance. *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 407 (Tex.1985). The premium cost is passed on in the price of the employer's product or service.

¶ 20 To facilitate workers' compensation and its objectives, an "industrial bargain" was imposed. The employee gave up the right to bring a common law negligence action against the employer and in return received automatic guaranteed medical and wage benefits. The employer gave up the common law defenses and received reduced exposure to liability. Thus, under section 11 of the Workers' Compensation Act "[e]very employer ... shall pay ... compensation ... for the disability or death of an employee arising out of and in the course of employment without regard to fault." That section, however, also enumerates certain exceptions to the Act based on an *employee's* (1) willful injury to self or another, (2) failure to use a guard or protection furnished against accident, (3) substance abuse, or (4) horseplay.

¶ 21 These statutory exceptions to workers' compensation coverage for an *employee's* willful misconduct must be factored into any balancing of interests between employer and employee. These legislative adjustments to the no-fault aspect of workers' compensation, which favor the employer, require that a less stringent standard than "specific intent" be applied in determining whether an employee may recover damages, as opposed to benefits, as a result of the employer's intentional misconduct. The substantial certainty standard strikes the proper balance by emphasizing employees' interest in protection from employer misconduct while maintaining employers' fixed liability for all but intentional workplace injuries.

¶ 22 Another policy consideration, that of workplace safety, has been and remains an important objective of workers' compensation. Few would argue that mere neglect of employee safety should not come exclusively within the purview of workers' compensation. At the same time, most would agree that an employer's specific intent to cause injury is beyond the scope of workers' compensation. But, as one treatise notes:

> The difficult case lies in between: where the employer [is] ... not motivated by a desire to harm employees, but certainly tak[es] a calculated risk with their lives and safety—and perhaps tak[es] all the greater risk because the employer knows that when injury inevitably does occur, the cost will be less because of the exclusive remedy and limited compensation provisions of the workers' compensation act.

7 Causes of Action 2d 197, § 2 at 204. This Court concurs in the observation of the Michigan Supreme Court. "The problem with the true intentional tort test appears to be that it allows employers to injure and even kill employees and suffer only workers' compensation damages so long as the employer did not specifically intend to hurt the worker." *Beauchamp v. Dow Chem. Co.*, 427 Mich. 1, 398 N.W.2d 882, 893 (1986)(adopting the "substantial certainty" standard). The conclusion of the North Carolina Supreme Court succinctly states the rationale behind today's holding. "The substantial certainty standard satisfies the Act's purposes of providing trade-offs to competing interests and balancing these interests, while serving as a deterrent to intentional wrongdoing and promoting safety in the workplace." *Woodson*, 407 S.E.2d at 229. Today, Oklahoma joins those jurisdictions which have rejected the proposition that the specific intent to harm is required for an employer's conduct to be actionable in tort.

## PARAMETERS OF THE STANDARD

¶ 23 In adopting the "substantial certainty" standard, this Court is mindful that "[i]n applying the substantial certainty test, some courts have confused intentional, reckless, and even negligent misconduct, and therefore

blurred the line between intentional and accidental injuries." *Beauchamp*, 398 N.W.2d at 893. In a determined effort to prevent such confusion, the standard must be clearly articulated and its parameters defined.

¶ 24 In order for an employer's conduct to amount to an intentional tort, the employer must have (1) desired to bring about the worker's injury or (2) acted with the knowledge that such injury was substantially certain to result from the employer's conduct. Under the second part of this standard, the employer must have intended the act that caused the injury with knowledge that the injury was substantially certain to follow. The issue is not merely whether injury was substantially certain to occur, but whether the employer knew it was substantially certain to occur. The employer's subjective appreciation of the substantial certainty of injury must be demonstrated. In most cases, however, it will be necessary to demonstrate the employer's subjective realization by circumstantial evidence. Thus, an employer's knowledge may be inferred from the employer's conduct and all the surrounding circumstances.

¶ 25 To satisfy the "substantial certainty" standard, "more than knowledge and appreciation of the risk is necessary." *Id.* As Professor Prosser explains:

[T]he mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief or consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but it is not classified as an intentional wrong.

Prosser, § 8 at 32. Thus, the employer must have acted, or have failed to act, with the knowledge that injury was substantially certain, not merely likely, to occur. The employer must have knowledge of more than "foreseeable risk," more than "high probability," and more than "substantial likelihood."

Nothing short of the employer's knowledge of the "substantial certainty" of injury will remove the injured worker's claim from the exclusive remedy provision of the Workers' Compensation Act, thus allowing the worker to proceed in district court.

¶ 26 Mere allegations of intentional conduct will not circumvent the Workers' Compensation Act. The worker must allege facts which "plausibly demonstrate" that the employer's conduct was intentional under the "substantial certainty" standard. *Harn*, 506 N.W.2d at 95. "In terms of intentional tort then, the use of the word 'intent' in allegations 'is not a talisman that can change the allegations into colorable claims....'" *Mingachos v. CBS, Inc.*, 196 Conn. 91, 491 A.2d 368, 375 (1985)(quoting *Keating v. Shell Chem. Co.*, 610 F.2d 328, 332 (5th Cir.1980)).

¶ 27 This pronouncement is not intended to expand the narrow intentional tort exception to workers' compensation exclusivity.[3] Rather, it constitutes this Court's refusal to apply a stricter standard of intent to a worker's tort claim against the employer than the Restatement standard of intent which would be applied to any other intentional tort. By adopting the "substantial certainty" standard in workers' compensation, this Court furthers the workers' compensation objective of workplace safety while balancing the interests of employer and employee. At the same time, it furthers the general tort principle that injuries are to be compensated and anti-social behavior is to be discouraged." *See* Prosser, § 1 at 3.

## QUESTION TWO

¶ 28 The second question certified to this Court concerns an aspect of the test for determining statutory employer status under the Workers' Compensation Act. Under section 11(B)(1) of the Act, "the principal employer shall also be liable in the manner hereinafter specified for compensation due all direct employees, employees of the indepen-

---

3. Professor Larson, a strident critic of the "substantial certainty" standard, concedes that "[i]t is true that in most instances, the predicted flood of litigation has not occurred, mainly because the courts, undoubtedly conscious of the dangers, have been quite conservative about allowing these kinds of exceptions to exclusivity. Most have been careful to limit their use to the most egregious cases." Larson, at § 103.04[4].

dent contractors, subcontractors, or other employees engaged in the general employer's business." As a result, under section 12, "[t]ort immunity is afforded to principal employers who bear workers' compensation liability under section 11." *Armstrong v. Carr,* 2003 OK CIV APP 80, 77 P.3d 598, 601. A principal employer who is secondarily liable in workers' compensation has been termed a "statutory employer." The principal employer's workers' compensation liability and the corresponding tort immunity have been the subject of much litigation. *See Murphy v. Chickasha Mobile Homes, Inc.,* 1980 OK 75, 611 P.2d 243, 245–248 (describing evolution of this area of law in Oklahoma).

¶ 29 In *Bradley v. Clark,* 1990 OK 73, 804 P.2d 425, this Court adopted a three-tiered test to determine whether a statutory employment relationship exists. The test was crafted by the Louisiana Supreme Court in *Berry v. Holston Well Service, Inc.,* 488 So.2d 934 (La.1986). The first tier of the test asks whether the contract work is specialized or non-specialized. If the work is non-specialized, the second tier asks whether the contract work is part of the principal's trade, business, or occupation. *Id.* at 938. "The third and last tier of the ... analysis calls upon the court to determine whether the principal hirer was engaged, at the time of the injury, in the trade, business or occupation of the hired contractor." *Bradley,* 804 P.2d at 428 n. 10. The certified question concerns only the third tier of the test.

¶ 30 Bridgestone manufactures and distributes tires. It has facilities in the United States, Canada, Mexico, and Costa Rica. Bridgestone hired UNICCO, an independent contractor, to provide a wide range of maintenance services at its tire plant in Oklahoma City. The question for the federal court is whether Bridgestone was engaged in the trade, business, or occupation of UNICCO at the time of the worker's electrocution. The federal court asks this Court whether, in making that determination, only Bridgestone's tire plant in Oklahoma is to be considered or whether it is proper to consider all of Bridgestone's facilities, including those in other states and nations.

¶ 31 The question is resolved by an examination of the policy behind this Court's adoption of the test. This Court adopted the *Berry* test in *Bradley* because it favored "Louisiana's more restrictive approach" to "application of the double-coverage doctrine." *Bradley,* 804 P.2d at 428 & n. 10. In *Berry,* the Louisiana Supreme Court explained that a liberal and expansive application of statutory employer status had "transform[ed] a doctrine which was originally designed to provide secondary [workers' compensation] protection to an injured employee into one which grants [tort] immunity to principals regardless of whether they actually pay compensation." 488 So.2d at 937 (citation omitted). The *Berry* court further explained that "[a]s a result, principals have been elevated to a more preferred position than an injured employee's immediate employer in that the *quid pro quo* existing between the employee and his immediate employer (i.e. compensation regardless of fault for tort immunity) does not exist between the employee and the principal." *Id.* Thus, the stated purpose of the *Berry* test and of this Court's adoption of that test in *Bradley,* was to *restrict* application of statutory employer status.[4]

¶ 32 Nevertheless, Bridgestone asks this Court to hold that, in applying the third tier of the test for statutory employer status, the federal court should look at its entire enterprise, including its activities in other states and nations. To do so, however, would expand the application of statutory employer status in contravention of *Bradley's* stated purpose. This Court holds that for the purpose of the third tier of the test adopted in *Bradley,* only the principal's activities at its facilities within the State of Oklahoma are to be considered.

¶ 33 Other policy considerations lead to the same conclusion. No policy is served by providing preferential treatment to large corporations with widely diversified activities in various nations while a local employer engaged in the same business has only its

---

4. The Louisiana Legislature rejected the *Berry* test by amending its "statutory employer" provision. The test, however, retains its vigor in Oklahoma. *See Armstrong,* 77 P.3d at 602 n. 2.

activities in Oklahoma to consider in determining statutory employer status. Public policy requires that local and multinational employers be treated equally in applying the provisions of the Workers' Compensation Act.

¶ 34 Finally, as a practical matter, the scope of the inquiry into the principal employer's activities becomes overly broad and difficult to manage when facilities in other states and nations are at issue. Discovery becomes needlessly burdensome. The manner in which an employer chooses to structure its activities in other states and nations will not be considered relevant to statutory employer status in Oklahoma.

CERTIFIED QUESTIONS ANSWERED.

WATT, C.J., HARGRAVE, KAUGER, EDMONDSON, TAYLOR, JJ., concur.

WINCHESTER, V.C.J., LAVENDER and OPALA, JJ., dissent.

WINCHESTER, V.C.J., with whom LAVENDER, J. and OPALA, J. join, concurring in part, dissenting in part:

¶ 1 While I concur with the majority's analysis of the principal employer status issue, I respectfully dissent to their adoption of the "substantial certainty" standard of intent for an employee's tort claim against an employer. I would adopt the "true intentional tort" test, requiring an intentional or deliberate act by the employer with a desire to bring about the consequences of the act.

¶ 2 The Legislature enacted the workers' compensation system knowing that workers would be injured while on the job. The issue is how to define an intentional tort, for purposes of workplace injuries. I am guided by three fundamentals. First, the Legislature created an elaborate system with a special court, to address workers' compensation for workplace injuries. Second, Oklahoma's Workers' Compensation Act represents a mutual compromise. Third, the express words of the Legislature provide balance to competing interests. These lead me to conclude that the Legislature intended all but the most egregious circumstances to be covered by this statutory remedy.

¶ 3 This Court has held that when an injured employee received workers' compensation benefits, those benefits constituted an exclusive remedy that precluded a concurrent tort claim for potential compensatory and punitive damages. *Pryse Monument Company v. District Court of Kay County,* 1979 OK 71, ¶ 2, 595 P.2d 435, 436–37. The instant case involves a deceased employee whose widow received workers' compensation benefits. The majority's opinion allows a concurrent tort claim for potential compensatory and punitive damages. Thus, it conflicts with the teaching of *Pryse.* The Legislature did not intend this outcome when it adopted the Workers' Compensation Act.

¶ 4 The words chosen by the Legislature, "intentional acts," indicate a legislative intent to allow tort claims only for "true intentional torts." The standard set for such cases must be clear, concise and easily ascertainable. Only the "true intentional tort" test provides such an objective standard. The elusive "substantial certainty" test falls far short. A majority of jurisdictions, as cited in the majority opinion, do not utilize "substantial certainty". Indeed, only a small minority of a dozen states uses that test. The "true intentional tort" test provides the assurance that in those circumstances of egregious conduct, the standard of a true intentional tort under the common law will be met, thereby alerting an employer to anticipate liability in tort and an employee to file such a claim.

¶ 5 Accordingly, I respectfully dissent from this portion of the Court's holding today. I would hold that the "true intentional tort" test is the appropriate standard for determining whether an employer's conduct falls outside the exclusivity provisions of Oklahoma's Workers' Compensation Act.

OPALA, J., with whom WINCHESTER, V.C.J., joins, dissenting in part.

¶ 1 I would **not answer** today the first question posed by the certifying court in advance of receiving its order assuring us that the plaintiff's common-law tort claim is not barred against the two defendants herein

either (a) by plaintiff's earlier selection of the compensation remedy which she prosecuted to a successful conclusion [1] or (b) by issue preclusion [2] resulting from the compensation award's final order that finds the decedent's on-the-job injury was "accidental" (as opposed to inflicted **willfully** or in any other manner sufficient to pierce the employer's statutory § 12 immunity [3] from extra-compensation liability for the same harm).[4] While my dissent targets mainly the possibility that the first federal-court question is mooted by a two-fold bar, I write to explain where **I would place the line of demarcation** that separates an employer's § 12 immunity from its tort liability.

1. Included in the record from the United States District Court for the Western District of Oklahoma is Exhibit 1 (**order of the Workers' Compensation Court**) to UNICCO's Motion for Partial Summary Judgment. That order, entered 13 October 1999, **awarded benefits to Gwendolyn Kay Parret for the death of her husband, Glenn Parret**. *In the Matter of the Death of Glenn Parret, Deceased, Gwendolyn Kay Parret, Claimant v. UNICCO Service Co., Respondent, Travelers Insurance, Insurance Carrier* (Workers' Compensation Court, No. 99–11585A). **Bridgestone/Firestone, Inc., d/b/a Dayton Tire, a defendant in the federal-court litigation, was not a party to the compensation claim.**

2. This court recognized in *Anco Mfg. & Supply Co. v. Swank*, 1974 OK 78, 524 P.2d 7, 10, that the issue preclusion doctrine may be asserted defensively. The phrase " 'defensive use' of the doctrine ... means that a stranger to the judgment, ordinarily the defendant in the second action, relies upon a former judgment as conclusively establishing in his favor an issue which he must prove as an element of his defense." *Anco Mfg., supra*, 524 P.2d at 10 (citations omitted). There, issue preclusion was invoked as a defensive bar to relitigation of an issue then in the workers' compensation court, which had been determined (in favor of the party to be estopped) in an earlier district court proceeding.
"Collateral estoppel [issue preclusion], like the related doctrine of res judicata [claim preclusion], has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). In furtherance of those policies, the U.S. Supreme Court has, in recent years, broadened the scope of the doctrine of issue preclusion beyond its common-law limits. It has done so by abandoning the requirement of mutuality of parties (*Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct.

# I

# THE FIRST QUESTION CERTIFIED BY THE FEDERAL COURT MAY BE MOOTED BY A TWO–FOLD BAR— AN ELECTION OF REMEDIES OR ISSUE PRECLUSION

¶ 2 The first legal question posed to us— whether the employer is protected by the § 12 immunity from liability in tort—presents for our resolution a proposition of public law.[5] When confronting a matter of public law, this court is utterly free to choose *sua sponte* its own framework of dispositive legal problem-solving techniques (theories and remedial avenues) to arrive at the most appropriate answer.[6] If either of the two bars

1434, 28 L.Ed.2d 788 (1971)) and by conditionally approving the "offensive" use of issue preclusion by a nonparty to a prior lawsuit.

3. Immunity from tort liability is conferred upon employers by the provisions of 85 O.S.2001 § 12, whose text provides:
"The liability prescribed in Section 11 of this title *shall be exclusive and in place of all other liability of the employer and any of his employees* ... for such injury, loss of services, or death, to the employee, or the spouse, personal representative, parents, or dependents of the employee, or any other person...."
(emphasis added).

4. According to the award's findings by the Workers' Compensation Court, the worker was in the employ of UNICCO Service Co. on 20 July 1999 when he "sustained an **accidental personal injury** arising out and in the course of ... employment with the respondent, as a result of which ... [he] died on July 22, 1999." *In the Matter of the Death of Glenn Parret, Deceased, supra* note 1 (order entered 13 October 1999) (emphasis added).

5. *Amos v. Spiro Public Schools*, 2004 OK 4, ¶ 7, 85 P.3d 813, 816 (citing *Special Indemnity Fund v. Reynolds*, 1948 OK 14, ¶ 5, 188 P.2d 841, 842); *Reynolds v. Special Indemn. Fund*, 1986 OK 64, ¶ 14, 725 P.2d 1265, 1270; *National Gypsum Co. v. Brewster*, 1969 OK 185, ¶ 22, 461 P.2d 593, 596.

6. "When resolving a public-law question, we are free to choose *sua sponte* the dispositive public-law theory although the wrong one is advanced." *Yeatman v. Northern Oklahoma Resource Center of Enid*, 2004 OK 27, ¶ 15, 89 P.3d 1095, 1101; *Amos v. Spiro Public Schools, supra* note 5 at ¶ 7, 85 P.3d at 816; *Davis v. B.F. Goodrich*, 1992 OK 14, ¶ 3, 826 P.2d 587, 592–93 (Opala, C.J., concurring)(citing *Reynolds v. Special Indemn. Fund, supra* note 5 at ¶ 14, 725 P.2d at 1270).

described by this dissent is invocable against either defendant, that defendant's § 12 immunity becomes an academic issue. Once it is clear that the claim is not actionable against a party, the § 12 immunity interposed by that party is beyond the court's need to notice. **No party is ever called upon to raise its immunity from liability against a claim of another which is nonactionable.**

¶ 3 The barrier of (1) plaintiff's earlier remedy selection of compensation law and her successful prosecution of benefits' recovery[7] and/or (2) of issue preclusion by a Workers' Compensation Court's finding that decedent's on-the-job injury was "accidental" **must** be judicially removed as unavailable **before** this court can be called upon to consider the immediate employer's and the potential "principal employer's" § 12 immunity from tort liability. The latter employer, once found to stand in the status of principal employer, would fully enjoy the benefits of both legal barriers, if otherwise applicable.

## II

## THE EMPLOYER'S WORKERS' COMPENSATION IMMUNITY FROM LIABILITY SHOULD BE PLACED AT AND ALONG THE WILLFUL TORT LINE

¶ 4 An employer's § 12 immunity from tort liability should continue to stand where it has stood for nearly a century—at the willful tort line.[8] The court today reduces the outer limit of immunity to coincide with the reach of the so-called foreign doctrine of "substantial certainty."[9] The latter shrinks an employer's immunity by adding liability for the torts of gross negligence and reckless indifference. This doctrine is neither in harmony with Oklahoma's historical antecedents nor with its constitutional jurisprudence which gave birth to workers' compensation liability.[10]

¶ 5 The 1915 workers' compensation law abolished the employee's common-law negligence action against the employer and the latter's corollary defenses of contributory negligence and assumption of the risk.[11] In conformity with this tradeoff, workers obtained the benefit of employers' fault-free liability for on-the-job-injuries and employers received protection from answerability in tort.[12] In an early attack on the Act's constitutional validity, the court in *Adams v. Iten Biscuit Co.*[13] upheld the compensation law's exclusive remedy for work-related accidental injuries. *Iten* teaches that **willful and intentional injuries,** whether inflicted by the employer or employee, **are not to be considered accidental** and hence must be excluded from coverage. As a result of this early twentieth-century tradeoff, the obligations that the workers' compensation regime imposes on employers are absolutely inseparable from the perimeter of immunity that compensation law confers.[14]

---

**7.** *Pryse Monument Co. v. District Court,* 1979 OK 71, 595 P.2d 435, 437–38, teaches that an employee who has two available remedies for the same injury and has prosecuted one of them to conclusion is barred from resort to the other remedy.

**8.** Oklahoma first enacted workers' compensation law in 1915. 1915 Okl.Sess.Laws, Ch. 246, p. 574. See *Adams v. Iten Biscuit Co.,* 1917 OK 47, 162 P. 938, 940–41. Modern workers' compensation statutes remove the element of fault as a baseline requirement for ascribing liability for work-connected injuries and replace it with the concept of strict responsibility. For a discussion of strict liability's historical development, see Vernon Palmer, *A General Theory of the Inner Structure of Strict Liability: Common Law, Civil Law, and Comparative Law,* 62 Tul.L.Rev. 1303–1355 (1988).

**9.** *See, e.g., Beauchamp v. Dow Chem. Co.,* 427 Mich. 1, 398 N.W.2d 882, 893 (1986); *Woodson v. Rowland,* 329 N.C. 330, 407 S.E.2d 222, 229 (1991).

**10.** *Adams v. Iten Biscuit Co., supra* note 8 at 940–41.

**11.** 1915 Okl.Sess.Laws, Ch. 246, p. 574; *Adams v. Iten Biscuit Co., supra* note 8 at 940–41.

**12.** As the plain language of 85 O.S.2001 § 11 makes clear, all accidental on-the-job injuries must be channeled through the Workers' Compensation Court, but claims for intentional on-the-job delicts may be vindicated outside of the workers' compensation regime.

**13.** *Adams v. Iten Biscuit Co., supra* note 8 at 940–41.

¶ 6 Torts of gross negligence that are based on reckless indifference to the safety of an individual authorize the defense of contributory negligence, **but fall short of an intentional wrong's equivalent.**[15] I would leave the immunity line where it **should be** and **where it has stood correctly placed**—at the demarcation that separates torts in which contributory negligence is a defense from torts in which contributory negligence is not a defense. An employer would enjoy § 12 immunity if the tort is in the subclass of those to which contributory negligence may be interposed as a defense.[16] Where the law would not permit a defense of contributory negligence, the immunity would not avail because the harm could not be deemed accidental.[17]

## III

## SUMMARY

¶ 7 Because I concur only in the text of the court's answer to the second question, I would confine today's opinion to answering that question alone. I dissent from the court's answer to the first question.

¶ 8 I would leave within the § 12 immunity all cases in which the tort authorizes the employer's defense of contributory negligence. My view faithfully follows the trade-off analysis that is the very cornerstone of this court's jurisprudence which provided constitutional approval for the workers' compensation regime.

---

**14.** The court reaffirmed the teachings of *Adams v. Iten Biscuit Co., supra* note 8, in *United States Zinc Co. v. Ross,* 1922 OK 247, 208 P. 805, 806, stating that workers' compensation is an exclusive remedy "unless the injury was willfully inflicted by the employer." The court cited *Adams v. Iten Biscuit Co.* in *Hull v. Wolfe,* 1964 OK 118, 393 P.2d 491, 493, stating: "This Court declared the Act was intended to cover all accidental injuries, but **did not include willful or intentional injuries whether inflicted by the employer or the employee, since [they are]** ... **not accidental.**" (emphasis added). **Both** the terms of 85 O.S.2001 § 12 and Oklahoma's jurisprudence **bar contributory negligence as a defense against the claim.** The text of 85 O.S.2001 § 11 clearly provides that an injury is compensable "without regard to fault" on the worker's part.

**15.** *Graham v. Keuchel,* 1993 OK 6, 847 P.2d 342, 357. Gross negligence is characterized as reckless indifference to the consequences. *Wootan v. Shaw,* 1951 OK 307, ¶ 22, 237 P.2d 442, 444.

**16.** *Adams v. Iten Biscuit Co., supra* note 8 at 940–41.

**17.** To give rise to a tort claim that will stand *dehors* compensation law, an intentional on-the-job tort must be the product of the employer's knowing and willful intent to cause injury. *De-Anda v. AIU Insurance,* 2004 OK 54, ¶ 10, 98 P.3d 1080 (Opala, V.C.J., concurring); *Pursell v. Pizza Inn Inc.,* 1990 OK CIV APP 4 ¶ 3, 786 P.2d 716, 717; *Roberts v. Barclay,* 1962 OK 38 ¶ 4, 369 P.2d 808, 809. *Id.* at ¶ 32–34, 435–36. The inflicted injury must be neither one that is in the normal employee/employer relationship nor one that stems from a risk directly related to the employee's service. *Id.* at ¶ 34, at 436. Because the workers' compensation *quid pro quo* eliminated fault as a basis for on-the-job-injury liability, the fact that harm inflicted upon the worker was the product of an employer's reckless indifference is irrelevant as long as the resulting harm was from an employment-related risk. *Harrington v. Certified Systems Inc.,* 2001 OK CIV APP 53 ¶ 34, 45 P.3d 430, 436.