OSCN Found Document:TIGER v. VERDIGRIS VALLEY ELECTRIC COOPERATIVE

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 TIGER v. VERDIGRIS VALLEY ELECTRIC COOPERATIVE
2016 OK 74
Case Number: 112777
Decided: 06/21/2016
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2016 OK 74, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

Misty Darlene Tiger, individually and as Administrator of the Estate of Jason Lee Tiger, deceased; J.L.T., a minor child; and B.L.T., a minor child, by and through their natural mother and next friend, Misty Darlene Tiger, Appellants,
v.
Verdigris Valley Electric Cooperative, an Oklahoma not for profit cooperative, Appellee,
and
Integrated Service Company LLC, d/b/a INSERV, an Oklahoma limited liability company, Defendant.

CERTIORARI TO THE COURT OF CIVIL APPEALS
Division I

¶0 Widow and children of deceased worker brought an action pursuant to Parret v. UNICCO Service Co., 2005 OK 54, 127 P.3d 572, asserting that decedent's employer knew that injury or death was substantially certain to result from the task decedent and his coworkers were directed to complete and the conditions in which they were required to work. The District Court, Honorable Dwayne Steidley, denied the employer's motion for summary judgment but granted a second motion for summary judgment after additional discovery. The Court of Civil Appeals affirmed.

CERTIORARI PREVIOUSLY GRANTED;
OPINION OF COURT OF CIVIL APPEALS VACATED;
DISTRICT COURT REVERSED;
CAUSE REMANDED.

Bryce A. Hill, Law Office of Bryce A. Hill, Tulsa, Oklahoma; and Jack G. Zurawik, The Zurawik Law Firm, Tulsa, Oklahoma, for Appellants.
Richard A. Gann, Stephen B. Riley, Thomas M. Askew, Stephanie L. Theban, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, Oklahoma, for Appellee.

COLBERT, J.

¶1 The issue in this matter is whether summary judgment was properly granted to decedent's employer pursuant to Parret v. UNICCO Service Co., 2005 OK 54, 127 P.3d 572. Because material issues of fact remain in dispute, this cause must be remanded to the trial court for proceedings consistent with this opinion.

FACTS AND PROCEDURAL HISTORY

¶2 On January 9, 2008, a field engineer for Verdigris Valley Electric Cooperative (Employer) met with a contract electrician for Integrated Service Company LLC (INSERV) in Catoosa, Oklahoma, concerning the installation of additional underground electrical service. They discussed the location of the additional service to the building and decided to use an existing junction box which the engineer observed was surrounded by a yellow metal barricade. He would later note: "I normally recommend that our members [customers] install a protective post an [sic] each corner of a pad mounted device in high traffic areas such as the INSERV plant, to help protect from getting ran [sic] over by vehicles or other equipment. I would never suggest having a barrier of any kind in front of any opening or door on VVEC equipment."

¶3 On June 5, 2008, a work crew from Employer was dispatched to install additional underground electrical service to INSERV. The four-man crew consisted of Jones, Jackson, Day, and Tiger. Jones and Jackson were journeymen electricians and Jones was the foreman. Day and Tiger were apprentices. Tiger had been in the journeyman apprentice program for approximately nine months of a four-year program. At the time of his death, Tiger had been certified only in the climbing school portion of his journeyman training. Day had worked for Employer only one month.

¶4 To provide the additional electric service to INSERV, the work crew would install three underground cables from a junction box to a transformer located on INSERV's premises. Employer, through its employees, decided the system would remain energized with high voltage electricity so that customers would not be inconvenienced by an interruption in electrical service. The existing junction box was energized with nominal 14,000/24,900 volts that would then transfer that high voltage electricity to the new service transformer and convert ("step down") the electricity into a much lower useable voltage which could be used by INSERV to run equipment.

¶5 When the crew arrived at the work site, they found the junction box surrounded by a yellow painted steel barricade, erected presumably to protect it from being struck by vehicles or trailers. The record does not establish who erected or owned the barricade, but Employer owned the junction box and associated electrical equipment. Affixed to the junction box was a warning concerning hazardous voltage and underground power cables and a notice from Employer which stated: "We need room to work safely on this device. Please keep shrubs and structures 10 feet away from the side with doors and 3 feet from the other sides. Obstructions may be damaged or removed during service restoration or maintenance." Employer had attached such stickers to its equipment for several years preceding Tiger's electrocution.

¶6 The barricade consisted of four corner posts with two rails connecting each post. The barricade did not satisfy the set back requirements of Employer's notice to keep structures ten feet away from the door and three feet away from the other sides. It also did not satisfy the set back requirements of the Occupational Safety and Health Administration (OSHA), the National Electric Safety Code, and the Oklahoma Administrative Code, which adopted the 2002 edition of the National Electric Safety Code. The space between the junction box and the metal barricade was six and one half inches at the left side, eight inches at the right side, and eleven inches at the back. The height of the top rail varied from thirty-seven to forty-six inches. Most importantly, only nineteen inches separated the front of the junction box and the metal barricade. Employer's work crews understood that if an obstruction needed to be removed, they had the authority to do so. The foreman of the work crew would later explain that he viewed the barricade as a "hindrance" rather than a safety issue and did not remove the barricade or cut the flow of electricity to the junction box. However, the "Job Briefing Form," which was signed by the foreman and initialed by each of the work crew "to document hazard recognition and work procedures," documented the work crew's full knowledge that they would "work in [a] hot cabinet" and that the installation would require "hard hats, safety glasses, rubber gloves, [and an insulated] blanket."

¶7 Each of the three cables installed to connect the junction box with the transformer would comprise the three phase service (phases A, B, and C). They would be capped off by installing connections that would operate as a "plug" to be inserted into its own bushing located within the junction box and within the transformer. This would permit electricity to flow from an overhead line into the junction box and into the INSERV transformer. An eight-foot long insulated rod known as a "shotgun stick" would be used to push the plug into the the opening of the bushing on the junction box while another crew member wearing insulated gloves would guide the connection. This process was to be repeated for each of the three cables.

¶8 The work crew began its installation by pulling wire through the underground conduit that had been placed between the transformer and the junction box. They then attached connectors to the ends of the phase wires and seated those connectors into bushings on the transformer rather than placing the connectors in "parking stands"[1] to be seated later, after the junction box end of the wires had been fitted with connectors and seated into bushings within the junction box. The crew then took thirty minutes for lunch. Connections were installed on the junction box end of each cable. Jackson used the shotgun stick from a position outside the barricade to successfully insert cable "A" into the bushing on the junction box while Tiger leaned over the barricade using the insulated gloves to guide the connection.

¶9 Jackson then attached the shotgun stick to cable "B" while Tiger attempted to approximate the connection for that cable. However, the steel barricade was so close to the junction box that there were only nineteen inches of clearance between the barricade and the front work area of the junction box. After numerous attempts, to seat the phase B connector into the designated bushing of the junction box, it was determined that the task could not be accomplished from outside the steel barricade. With no admonition or warning from the crew foreman Jones, journeyman Jackson, or any other member of the work crew, Tiger climbed over the barricade to position his six feet two inches 200 pound frame inside the nineteen inches of space between the junction box and the steel barricade to assist in lining up the B phase connector with the bushing of the junction box so that it could be seated. As Jackson was making the connection, Tiger stepped back from Phase B, made contact with phase C, and screamed. He then appeared to freeze and not move. Within two to three seconds, Jones realized that Tiger was being shocked. Jones retrieved the "extendo stick" from the truck and ran an estimated 200 to 500 feet to the utility pole where the fuses were located to turn off the power. It took an estimated one to three minutes to pull the three fuses to interrupt the flow of high voltage electricity passing through Tiger's body. After the power was cut, the work crew pulled Tiger from the barricade. Resuscitation efforts failed and Tiger was pronounced dead at a local hospital.

¶10 Subsequent investigation into the cause of Tiger's electrocution revealed that, when Phase A was connected to the junction box, it energized the core of the transformer which then allowed "back feed" to the unconnected Phases B and C at the junction box. The parties would later dispute the role of the barricade in the electrocution. The United States Department of Labor, Occupational Safety and Health Administration, issued a citation for two "serious" safety violations. Under OSHA, "the word serious as used in serious hazard, serious violation or serious condition means a hazard, violation or condition such that there is a substantial probability that death or serious physical harm could result." 29 C.F.R. § 1960.2(v). The citation provided:

Citation 1 Item 1 Type of Violation: Serious
29 CFR 1910.269(a)(2)(iv)(B): Employees did not receive additional training where new types of equipment and changes in procedures necessitated the use of equipment that were different from those which the employee(s) would normally use.
On or about June 5, 2008, at the work site, employer did not train employee adequately on procedures of safety-related work practices that were different from those normally used, exposing employee to the hazards of electrocution by coming in contact with live parts while working inside of metal enclosed fence or barricade.

Citation 1 Item 2 Type of Violation: Serious
29 CFR 1910.269(c): Employer shall ensure that the employee(s) in charge conducts a job briefing with the employees involved before the start of each job.
On or about June 5, 2008, at the work site, employer did not brief employee on hazards associated with the job, work procedures involved, special precautions, energy source controls, and personal protective equipment requirements, such as, rubber insulating blanket and other additional personal protection equipment (PPE) exposing employee to the hazards of electrocution by coming in contact with live parts while inside of a metal enclosed/barricade.

OSHA ordered abatement of the violations and assessed a proposed penalty.

¶11 This action was brought in the District Court against Employer and INSERV on June 3, 2009. It alleged that Employer's choice to direct the work crew to install new service with a steel barricade located within nineteen inches of a high-voltage junction box demonstrated Employer's substantial certainty that serious injury or death to a worker would result. INSERV was dismissed from the action with prejudice on December 17, 2010. Employer moved for summary judgment in July, 2011. The trial court denied the motion, noting a list of facts to support an inference of Employer's knowledge of a substantial certainty that injury or death would result from its conduct.

¶12 Following the deposition of Plaintiffs' expert, Employer filed a second motion it termed a "Post-Discovery Motion for Summary Judgment." It emphasized Employer's safety record and the lack of dispute that Employer is a "safety-oriented" company. The trial court noted that members of the work crew had been trained concerning back-feed but had forgotten their training and therefore failed to apply it. The trial court further emphasized that, under company policy, Employer and its employees are "jointly responsible for safety." It concluded Employer was not aware of its "employee training deficiencies" until after Tiger's death. The motion was granted and the Court of Civil Appeals affirmed. This Court granted certiorari review.

STANDARD OF REVIEW

¶13 The appellate standard of review of a summary judgment is de novo. Kirkpatrick v. Chrysler Corp., 1996 OK 136, ¶ 2, 920 P.2d 122, 124. The evidentiary materials will be examined to determine what facts are material and whether there is a substantial controversy as to any material fact. See Sperling v. Marler, 1998 OK 81, 963 P.2d 577; Malson v. Palmer Broad. Grp., 1997 OK 42, 936 P.2d 940. All inferences and conclusions to be drawn from the materials must be viewed in a light most favorable to the nonmoving party. Carmichael v. Beller, 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053. Even when the facts are not controverted, if reasonable persons may draw different conclusions from the facts summary judgment must be denied. Bird v. Coleman, 1997 OK 44, ¶ 20, 939 P.2d 1123, 1127. Summary judgment is proper only if the record reveals uncontroverted material facts failing to support any legitimate inference in favor of the nonmoving party. N.C. Corff P'ship, Ltd. v. OXY USA, Inc., 1996 OK CIV APP 92, ¶ 8, 929 P.2d 288, 292. When genuine issues of material fact exist, summary judgment should be denied and the question becomes one for determination by the trier of fact. Brown v. Okla. State Bank & Trust Co., 1993 OK 117, ¶ 7, 860 P.2d 230, 233. Because the trial court has the limited role of determining whether there are such issues of fact, it may not determine fact issues on a motion for summary judgment nor may it weigh the evidence. Stuckey v. Young Exp. Co., 1978 OK 128, ¶ 15, 586 P.2d 726, 730.

ANALYSIS

¶14 Because the incident that gave rise to this action occurred in 2008, the applicable law is found in this Court's pronouncement in Parret v. UNNICO, 2005 OK 54, 127 P.3d 572.[2] There, this Court determined the standard for when an employer's conduct is intentional therefore placing the employee's claim for injury or death outside the exclusive remedy provision of the Workers' Compensation Act. The Parret holding is summarized well by the comment to Oklahoma Uniform Jury Instruction (Civil) 6.16 which explains:

In order for an employer's conduct to amount to an intentional tort, the employer must have (1) desired to bring about the worker's injury or (2) acted with the knowledge that such injury was substantially certain to result from the employer's conduct. Under the second part of this standard, the employer must have intended the act that caused the injury with knowledge that the injury was substantially certain to follow. The issue is not merely whether injury was substantially certain to occur, but whether the employer knew it was substantially certain to occur. The employer's subjective appreciation of the substantial certainty of injury must be demonstrated. In most cases, however, it will be necessary to demonstrate the employer's subjective realization by circumstantial evidence. Thus, an employer's knowledge may be inferred from the employer's conduct and all the surrounding circumstances.

(Emphasis added).

¶15 Parret examined the policy considerations underlying the substantial certainty standard and noted that it was designed for:

[t]he difficult case . . . where the employer [is] not motivated by a desire to harm employees, but certainly tak[es] a calculated risk with their lives and safety-and perhaps takes all the greater risk because the employer knows that when injury inevitably does occur, the cost will be less because of the exclusive remedy and limited compensation provisions of the workers' compensation act.

2005 OK 54, ¶ 22, (quoting 7 Causes of Action 2d 197, § 2 at 204). In determining whether this matter presents such a difficult case, the question becomes whether Employer's conduct and the surrounding circumstances support an inference of Employer's substantial certainty that injury or death to a worker would result from its conduct.

¶16 The lower courts held, as a matter of law, Employer's knowledge concerning the condition of the work site or the actions of its work crew did not demonstrate its substantial certainty that a worker would be injured or killed. That conclusion failed to consider that the knowledge or notice possessed by an agent while acting within the scope of authority is the knowledge of, or notice to the principal. Bailey v. Gulf Ins. Co., 389 F.2d 889, 891 (10th Cir. 1968). Thus, the lower courts' emphasis on the fact Employer was generally a "safety minded" organization and its safety record was good overall, was entirely misplaced. Similarly, the trial court's emphasis on the "joint responsibility" between Employer and its employees for workplace safety found in the company policy manual does not control this matter. See Graham v. Keuchel, 1993 OK 6, ¶ 52, 847 P.2d 342 (claim for intentional tort is not subject to defense of contributory or comparative negligence).

¶17 This matter presents facts very similar to those found in Parret. There, an electrical worker was directed to work on emergency lights while they remained energized. The worker was electrocuted and died as a result. This Court adopted the substantial certainty standard in response to a federal certified question and explained the standard's parameters and underlying policy considerations. In this matter, the foreman and the other journeyman electrician instructed one apprentice, Day, to move far away from the barricade. The other apprentice, Tiger-- who had no experience or training in high voltage installation-- was allowed to take on the most dangerous task at the work site by crawling over a metal barricade without an insulated blanket in an attempt to connect cables to a junction box energized with high voltage electricity with insufficient clearance.

¶18 Employer, through its employees, made several fateful decisions from which a jury could at least infer Employer's substantial certainty that at least one member of its work crew would be injured or killed as a result of its conduct or omissions. Those decisions began with the conduct of Employer's field engineer who sets out the policy and procedure for completing a project and who discussed with INSERV the options for the location of additional electric service. At that time, the engineer noticed the yellow metal barricade surrounding the junction box. Although he would later state that he would never recommend such a barricade, he did nothing to cause the work crew to modify or remove the illegal obstruction. Such conduct went beyond reckless disregard and deliberate indifference. It indicates Employer's substantial certainty that someone would be injured or killed by entering the steel barricade with less than nineteen inches from the barricade and the door of the junction box.

¶19 Those decisions continued with those of the work crew foreman, Jones, who acted as Employer's on-site policy maker concerning safety and apprentice training. Those decisions regarding safety, supervision, and apprentice training imply Employer's substantial certainty that serious injury or death would result from its conduct. They include: (1) not cutting the power and therefore placing the convenience of its customers over the safety of its employees; (2) not using the parking stands provided on the transformer and junction box; (3) not removing the illegal metal barricade or at least the front of the barricade; (4) not placing safety blankets over the metal barricade; and (5) allowing a six foot two, two hundred pound apprentice to assume the most dangerous position for installation of the high-voltage electrical service and enter the insufficient space between the high voltage junction box and the illegal barricade.

¶20 The record before this Court demonstrates overwhelming issues of material fact in dispute making summary judgment inappropriate. Those include Tiger's understanding of electricity and his experience installing high-voltage electric service. It is also unclear whether Tiger and Employer's work crew were required to work on the electrical system while it was "hot" and whether, under the circumstances, serious injury or death was substantially certain to occur. The parties disagree whether Employer's conduct rose to the level of intent necessary to maintain an action in tort notwithstanding the exclusive remedy provision of the Workers' Compensation Act.

CONCLUSION

¶21 The central question of fact, which was present throughout this litigation, is whether there is at least an inference from the facts and circumstances surrounding this incident that Employer was substantially certain a worker could be injured or killed by working on electrical cables within a steel barricade with only nineteen inches of clearance between it and the high-voltage junction box contrary to OSHA rules[3], the electrical code, state law, and Employer's own warning sticker. That question is one for the trier of fact on remand.

CERTIORARI PREVIOUSLY GRANTED;
OPINION OF COURT OF CIVIL APPEALS VACATED;
DISTRICT COURT REVERSED;
CAUSE REMANDED.

CONCUR: Reif, C.J., Watt, Edmondson, Colbert,, and Gurich, JJ.

CONCURS BY REASON OF STARE DECISIS: Kauger, J.

DISSENT: Combs, V.C.J., Winchester, and Taylor, JJ.

FOOTNOTES

[1] "Parking" each phase means inserting the connections at the transformer or junction box into an insulated bushing known as a parking stand, which would prevent the flow of electric power to the transformer or junction box until all of the phases in the junction box have been connected.

[2] The Parret standard was adopted in 2005. It was superseded by the Oklahoma Legislature's revisions to the Workers' Compensation Act in 2010. 2010 Okla. Sess.Laws chap.452 § 3. Those revisions included the amendment to section 12 of the Act which made "specific intent" to injure the operative test by providing:

An intentional tort shall exist only when the employee is injured as a result of willful, deliberate, specific intent of the employer to cause such injury. Allegations or proof that the employer had knowledge that such injury was substantially certain to result from its conduct shall not constitute an intentional tort. The issue of whether an act is an intentional tort shall be a question of law for the Court. . . .
Okla. Stat. tit. 85, § 12 (Supp. 2010)(eff. August 27, 2010). The same definition of intentional tort was carried forward in 2011 when the Oklahoma Legislature repealed section 12 and inserted the definition into section 302. Okla Stat. tit.85, § 302(B)(Supp. 2011). The same definition of intentional tort appears in the Administrative Workers' Compensation Act which became effective February 1, 2014. Okla Stat. tit. 85A, §5(B)(2) (Supp. 2014). Therefore, for any injury occurring after August 26, 2010, the substantial certainty standard is unavailable to an injured worker.

[3] Concerning the OSHA "serious violations" issued against Employer, these violations do not alone conclusively establish Employer's substantial certainty of injury or death. They do, however, constitute circumstantial evidence of that intent.






 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 1996 OK CIV APP 92, 929 P.2d 288, 67 OBJ 3890, N.C. Corff Partnership, Ltd. v. OXY USA, Inc.,
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1993 OK 6, 847 P.2d 342, 64 OBJ 420, Graham v. Keuchel
Discussed
 1993 OK 117, 860 P.2d 230, 64 OBJ 2882, Brown v. Oklahoma State Bank & Trust Co. of Vinita
Discussed
 1997 OK 42, 936 P.2d 940, 68 OBJ 1454, Malson v. Palmer Broadcasting Group
Discussed
 1997 OK 44, 939 P.2d 1123, 68 OBJ 1161, Bird v. Coleman
Discussed
 2005 OK 54, 127 P.3d 572, PARRET v. UNICCO SERVICE COMPANY
Discussed at Length
 1996 OK 48, 914 P.2d 1051, 67 OBJ 1173, Carmichael v. Beller
Discussed
 1996 OK 136, 920 P.2d 122, 67 OBJ 2065, Kirkpatrick v. Chrysler Corp.
Discussed
 1978 OK 128, 586 P.2d 726, STUCKEY v. YOUNG EXPLORATION CO.
Discussed
 1998 OK 81, 963 P.2d 577, 69 OBJ 2638, Sperling v. Marler
Discussed