1998 OK CIV APP 83

**CENTRAL PLAINS CONSTRUCTION and The State Insurance Fund, Petitioners,**

**and**

**C.J. Tate & Sons and The State Insurance Fund, Counter–Petitioners,**

**v.**

**Dennis Leverne HICKSON and the Workers' Compensation Court, Respondents.**

**No. 90186.**

Court of Civil Appeals of Oklahoma, Division No. 3.

May 26, 1998.

Darren Derryberry, Victor F. Trautmann, Oklahoma City, for Petitioners.

William W. Wiles, Oklahoma City, for Counter–Petitioners.

Brandon J. Burton, Lew Gravitt, Oklahoma City, for Respondents.

## OPINION

ADAMS, Judge:

¶1 After he was injured in an attack by a co-worker, Claimant Dennis Hickson filed a workers' compensation claim naming Central Plains Construction (Central Plains) as his employer. Subsequently, Central Plains moved to join C.J. Tate & Sons (Tate), contending Tate was the actual employer. Tate ultimately agreed that Claimant was its employee but argued that it was engaged in a joint venture with Central Plains on the project on which Claimant worked.

¶2 After hearing, the Workers' Compensation Court trial judge entered an order containing special findings that Central Plains and Tate were joint venturers on a construction project for the Oklahoma Department of Transportation four miles west of Mangum, Oklahoma, and that Claimant worked on that project. The trial judge also found that Claimant was injured in the course of his employment with the joint venture and that Claimant's injury arose out of his employment, and entered an order directing Central Plains and Tate to pay Claimant benefits for temporary total disability, permanent partial disability, and disfigurement.[1] An *en banc* appeal resulted in a three-judge panel order modifying the amount of benefits due Claimant, but leaving intact the remainder of the order. This review proceeding followed.[2]

¶3 Claimant's claim arises from injuries due to an attack upon him by a co-worker, L, with whom Claimant was sharing a two-bed motel room. The room had been rented by Joe Skeith (who was identified by Claimant and a representative of Tate as owner of Central Plains) for the use of the workers from Central Plains and two or three regular employees of Tate during the Mangum project. On October 19, 1995, the workers were paid, and, as was their custom, several of them had dinner and then went out to socialize that evening. L became "rowdy," "ornery" and aggressive towards other patrons while they were at a club. Skeith asked Claimant and another worker to take the man back to the motel and gave them the keys to his personal vehicle to do so. They took L to the motel and returned to the club for further socializing.

¶4 Claimant later returned to the motel room and found L and a partially clothed woman in the room. L promptly left (leaving his room key behind), and after she dressed, the woman also left the room. Claimant prepared for bed and went to sleep. In the early hours of the morning L returned, and Claimant let him back in the room. The next thing Claimant remembers was awakening to find himself being attacked. L, apparently in a delusional state, was astride Claimant on the bed. Claimant struggled with L and sustained a knife wound to the chest. Skeith, who had been asleep in the next room, was awakened by the struggle and Claimant's calls for help. Skeith summoned help, and Claimant was taken to hospital.

## DID CLAIMANT'S INJURY ARISE OUT OF AND IN THE COURSE OF HIS EMPLOYMENT?

¶5 Whether an injury is incurred in the "course of" employment relates to the time, place or circumstances under which the injury was sustained. *Thomas v. Keith Hensel Optical Labs*, 1982 OK 120, 653 P.2d 201. An injury "arises" out of employment when there is a causal connection between the injury and the risks incident to employment. *American Management Systems, Inc. v. Burns*, 1995 OK 58, 903 P.2d 288.

¶6 Central Plains claims that because Claimant's presence in the motel

---

1. The trial court also found specifically that Claimant had been placed at a risk of injury which exceeded the exposure of the general public.

2. Central Plains filed its petition for review in Case No. 90,186. Tate filed a separate petition for review in Case No. 90,253. A November 21, 1997 order of the Oklahoma Supreme Court consolidated the proceedings under surviving Case No. 90,186, with Central Plains to proceed as petitioner and Tate as counter-petitioner. Claimant has filed no petition for review. Therefore we do not consider the suggestion contained in his Answer Brief that the Workers' Compensation Court erred in granting a credit for overpayment of temporary total disability benefits and that we should set that credit aside.

room was purely voluntary and for his own personal convenience, there is no competent evidence to support the conclusion that his injury was incurred "in the course of" his employment. We disagree. It is unrefuted that when a job site was far enough away from a worker's home, Central Plains normally provided accommodations, along with transportation from the motel to the job site. Although there is some controversy over whether Claimant was entitled to stay in the motel room or whether his presence there was permissive, this record contains competent evidence from which the trial court could conclude that Claimant lived far enough away from the work site that he would have been entitled to stay in a room under the policy described.[3] Where, as here, a claimant is away from home due to employment and stayed overnight as a result, an injury sustained while in that travel status is one "in the course of" employment. *Accord, Burns,* 1995 OK 58, ¶ 5, 903 P.2d at 291.

¶ 7 Tate and Central Plains argue the risk encountered by Claimant did not arise from his employment. In support, Tate cites the rejection of the "positional risk" test or doctrine[4] by the Court in *Burns,* and notes that, as stated in *Copeland v. Boots Pharmaceuticals,* 1996 OK CIV APP 8, ¶ 11, 916 P.2d 277, 280, "it is no longer sufficient to prove merely that the employment required a worker to be in a particular place and that he was injured while there." This analysis is correct insofar as it goes, but this record contains evidentiary materials requiring further analysis.

¶ 8 The workers on this job were expected to share a room. Skeith preferred to room with a particular co-worker from Cen-

tral Plains. Skeith did not want to room with L or Claimant, apparently because they snored, and let the workers know his choice of roommate. A third room was occupied by the workers from Tate, who preferred to room together. Therefore, because of the way the other workers associated, Claimant had no option of which room to occupy. The only vacant bed was in the room with L. Unlike in *Burns,* Claimant's assailant was not an unknown third party but the very co-worker his employer caused to be present in the room.

¶ 9 There was no evidence of personal animosity between L and Claimant, and the two had roomed together on a prior job for over six months without incident. Skeith knew L had a drug problem in the past and that he had been fired, given a second chance at Central Plains, and thereafter was working on this job with Tate. L was described as acting drunk and/or drugged as well as being belligerent while at the club immediately prior to when Skeith instructed Claimant and the other worker take him back to the motel.

¶ 10 Whether an injury arises out of employment is a fact question for the Workers' Compensation Court, and the increased risk test applies when determining if an injury arises out of employment. *Odyssey/Americare of Oklahoma v. Worden,* 1997 OK 136, 948 P.2d 309. Under that test, the question is whether Claimant's employment subjected him to a risk that exceeded the ordinary hazards to which the general public is exposed. This record contains competent evidence from which the Workers' Compensation Court could conclude that the risks attendant to being confined in a motel room with L were not shared by the general public

---

**3.** Although another worker originally planned to room with L, that worker decided to stay with relatives in the area instead. Skeith testified in his deposition that workers who lived within 60 miles or, under a published policy of Central Plains, within one hour's drive from a work site were expected to drive to the site from their homes and that housing (either motel rooms or on site recreational vehicles or trailers) were provided for jobs further away. David Tate testified Tate provided housing if the job was more than fifty miles away. There was competent evidence admitted that Claimant's home was more than 80 miles away from the job site.

Therefore, under either of the described policies, he would have been entitled to have housing provided to him.

**4.** The positional risk doctrine holds that an injury arises out of employment if the injury would not have occurred but for the fact that the conditions or obligations of employment placed a claimant in the position where the claimant was injured by a neutral force, that is a force neither personal to the claimant nor associated with the employment. *Burns,* 1995 OK 58, n. 13, 903 P.2d at 291–292, n. 13.

or otherwise neutral, and were causally related to Claimant's employment on this job. *Accord, Superior Stucco v. Daniels*, 1995 OK 127, 912 P.2d 317.

## WERE CENTRAL PLAINS AND TATE ENGAGED IN A JOINT VENTURE?

¶ 11 Even if Claimant's injury arose out of and in the course of his employment on the Mangum project, Central Plains denies the existence of a joint venture and of an employer-employee relationship between itself and Claimant at the time of injury. Tate and Claimant argue the Workers' Compensation Court correctly concluded Central Plains is jointly and severally liable with Tate for the benefits due Claimant.

¶ 12 No single factor alone is sufficient to establish that parties are in a joint venture, but three requisite elements have been identified: (1) the parties possess a joint interest in the property utilized in the venture; (2) the parties agree, either by express or implied agreement, to share in the profits and losses of the venture; and (3) the action or conduct of the parties evidences cooperation in the performance of the venture. *Pfleider v. Smith*, 1962 OK 31, 370 P.2d 17; *Boren v. Scott*, 1996 OK CIV APP 115, 928 P.2d 327. Tate stipulated that Claimant was its employee. Whether a joint venture is an employer is a fact question, but because the Workers' Compensation Court's ability to also order payment by a joint venturer raises an issue about that Court's jurisdiction, we conduct an independent review. *Mendonca Dairy v. Mauldin*, 1966 OK 233, 420 P.2d 552.

¶ 13 Tate argues the relationship of the parties is similar to that of the joint venturers described in *Gragg v. James*, 1969 OK 58, 452 P.2d 579. Central Plains argues *Gragg* is only superficially similar because in that case the prime contractor allowed others to perform virtually all the work on the project in exchange for the use of its name and bonding capacity, whereas here Tate hired the workers and thereby conformed to contract limitations on subcontracting and both bonded the project and obtained workers' compensation insurance for its employees.

¶ 14 Although the relationship between Tate and Central Plains is structured differently than that of the parties in *Gragg*, the involvement of Central Plains was as important to the completion of this job as was the work of the subcontractors there. As in that case, the parties' status as joint venturers may be inferred from the purpose of the enterprise, their acts, and their conduct in relation to the engagement, which "may speak more strongly than the express declarations." *Gragg*, 1969 OK 58, ¶ 36, 452 P.2d at 587.

¶ 15 The arrangements between Tate and Central Plains were described in deposition testimony of Skeith and David Tate (of C.J. Tate and Sons), which was admitted in the case in chief in lieu of their live testimony. Both men agree that the arrangements were all verbal. They agree that Central Plains did not have bonding capacity to qualify for the job and Skeith approached Mr. Tate about working with Tate. Both Central Plains and Tate provided equipment used on the site.

¶ 16 Skeith testified that he contacted Tate because he wanted to secure work for his employees while Central Plains didn't have enough for them to do.[5] Skeith helped Tate formulate its bid, and Tate bid on the project and provided the bonding for it.[6] Claimant and three other men who usu-

---

5. Skeith testified Claimant was a "loaned servant" to Tate. The Workers' Compensation Court made no findings on this issue, and no party raises it in these review proceedings. We note, however, that even if Claimant was a loaned servant of Tate, Central Plains might not be relieved of liability for benefits. Ordinarily, that doctrine merely allows an injured worker to bring a claim against either his actual employer or the secondary employer to whom he was loaned. *Cherokee Lines, Inc. v. Bailey*, 1993 OK 111, 859 P.2d 1106.

6. Although not admitted into evidence, the parties agree that Department of Transportation rules prohibited subcontracting more than fifty per cent of a project and this was one reason Central Plains did not merely furnish its expertise, equipment and employees as a subcontractor.

ally worked for Central Plains were hired by Tate to work on the job near Mangum. Two or three regular employees of Tate also worked on the job.

¶ 17 Tate had the men from Central Plains fill out employment applications and tax forms, provided them with W–2 forms, and cut all their payroll checks. Tate withheld taxes, paid for insurance and workers' compensation for the workers on the job, and received three per cent of the gross for these services. David Tate testified that Skeith supervised on the job, set the work hours, arranged for housing for the workers and transportation from the motel to the job.

¶ 18 Skeith testified that he normally worked for Central Plains, and described his capacity as "down there as consulting only. I mean, it was more of an administrative, keep and [sic] eye on things." Questioned further about his role at the job, the following exchange occurred:

Q. You were there in a supervisory capacity?

A. Well, no, I—

Q. Were you interested in the outcome?

A. Absolutely. Supervisory or project coordination, however you want to call it.

Q. Okay. Were you there in a supervisory capacity?

A. Yeah, you could say that.

According to him, the job "in essence, was bid for Central Plains, okay, but under C.J. Tate and Sons."

¶ 19 Skeith kept track of hours worked by the men from Central Plains and of materials used, submitting those records to Tate for payments. He rented rooms in the name of and at the expense of Central Plains for all the men (both those from Central Plains and those from Tate) at a motel in Altus. Some of the workers used private vehicles to get from the motel to the job near Mangum and some used Central Plains' vehicles. Skeith testified that he received no personal compensation for his activities at the Mangum site, but that Central Plains received the balance left after expenses were paid, including the three per cent of gross owed Tate.

¶ 20 Central Plains argues the first requirement, a joint interest in property, is not satisfied. We disagree. The parties had a joint interest in the performance of the job, the object of the joint venture, just as did the parties in *LeFlore v. Reflections of Tulsa, Inc.*, 1985 OK 72, 708 P.2d 1068. In *LeFlore*, a radio station hosted a party at facilities provided by another joint venturer for which entertainment was provided by a third joint venturer. These different types of contributions to the joint goal were deemed sufficient to meet the first prong of the test for the existence of a joint venture. Here the contributions of both Tate and Central Plains are even more similar, with both contributing workers and equipment, although other contributions (housing expense, transportation, bonding capacity, administrative expertise, payroll administration, etc.) were different.

¶ 21 We fail to see how Central Plains' argument that Tate was in a better protected position financially if the job proved unprofitable advances its theory that it was not a joint venturer. As is noted in *Catlett v. Jordan*, 206 Okl. 473, 244 P.2d 564, 571 (1952), "it is not absolutely necessary that there be participation in both profits and losses." Thus, no explicit agreement for Central Plains to share in losses is required. Further, there is no dispute that Central Plains was to receive compensation based upon profits, and therefore was at risk of not being compensated if no profits were forthcoming. The second element necessary for a joint venture is well supported by this record.

¶ 22 Although Central Plains argues Skeith was present on the site as a consultant, it is clear he supervised and exercised direct authority, acts indicative of more control over the work on the project. As Skeith testified, he was there to "just to purely make sure that everything was going all right for my interest, for Central Plains interest, whatever they might be." The assistance of Central Plains' owner in the bidding process, the billing process, timekeeping, making housing arrangements, transportation, and the setting of hours, plus the profit participation and the renting of the motel rooms in the name of (and at the expense of)

Central Plains are indicative of cooperation satisfying the third element necessary for a joint venture as to this job.

¶ 23　We conclude the evidence supports the conclusion Central Plains and Tate operated as a joint venture on this job. The liability of joint venturers for workers' compensation benefits to an employee is joint and several. *W.B. Johnston Grain Company v. Self,* 1959 OK 169, 344 P.2d 653. Central Plains and Tate are jointly and severally liable to pay the benefits ordered.

### WAS CLAIMANT'S RATE FOR BENEFITS CALCULATED CORRECTLY?

¶ 24　Tate argues the Workers' Compensation Court should have used 85 O.S.Supp. 1992 § 21(3) to calculate Claimant's compensation rate because neither 85 O.S.Supp.1992 §§ 21(1) nor 21(2) reasonably and fairly represents Claimant's annual earnings in the employment in which he was working at the time of injury. To support this argument, Tate points to the evidence that Claimant's earnings for the entire preceding year were lower than the figure produced by the trial court. According to Tate, this lower figure was the result of the fact that Claimant's work was "seasonal" because he could not work during inclement weather or when his employer did not have a project.

¶ 25　Whether a claimant has worked in the necessary employment "during substantially the whole of the year immediately preceding his injury is a question of fact," but after this question has been determined the question of which of the first two subsections § 21 applies is solely a question of law. *Safeway Stores v. Mauk,* 1954 OK 287, 275 P.2d 987, 990. Further, the fact that computing average annual earnings under subsections §§ 21(1) or 21(2) yields a result in excess of the actual annual earnings of the employee is not alone a basis for concluding those subsections cannot be fairly and reasonably applied where there is competent evidence supporting the trial court's apparent application. *Jones v. Shattuck Convalesence/Amity Care Co.,* 1990 OK CIV APP 32, 792 P.2d 96.

¶ 26　While Claimant had worked at this particular job site only ten days when he was injured, he had been regularly employed by Central Plains since May of 1993.[7] The cases cited in support of the argument for the application of § 21(3) are best characterized as involving part time or seasonal workers. Claimant did state that weather and the availability of work sometimes meant he did not collect a paycheck, but he was a full time employee and Skeith did not cease operations regularly or operate Central Plains at only certain times of the year. To the contrary, the record reflects Skeith made efforts to keep all his crews employed throughout the year, including arranging for them to work on jobs Central Plains could not contract for in its own name.

¶ 27　The earning capacity of employees who worked or could work in an industry for the substantial whole of the year is not necessarily limited to their earning capacity calculated as if they had been seasonally employed, merely because the principal business of an employer might be intermittent. *Friendship Farmer's Co-op. Gin v. Allred,* 196 Okl. 462, 165 P.2d 838 (1945). Where earnings of a regular employee of a year round (not seasonal) business are curtailed by business conditions causing loss of time by the employee, § 21(1) and 21(2), not § 21(3), may still be applied, if the evidence supports it. *Eagle Picher Mining & Smelting Co. v. Lamkin,* 189 Okl. 463, 117 P.2d 519 (1941). The Workers' Compensation Court calculation of Claimant's rate for benefits is not contrary to law or unsupported by competent evidence.

7. In 1995, Skeith had a similar arrangement with another construction company to provide bonding and bid on a Department of Transportation job, and Central Plains' employees and Skeith came in to do the work. Claimant worked for that other company under that arrangement.

## CONCLUSION

¶ 28 Independent review of the record leads us to conclude that the Workers' Compensation Court correctly found that Central Plains and Tate were joint venturers on the project on which Claimant was employed. In all other respects, the decision of the Workers' Compensation Court is neither contrary to law nor unsupported by any competent evidence. The order is sustained.

SUSTAINED.

BUETTNER, P.J., and HANSEN, J., concur.