2010 OK 26

**Darla K. PRICE, Individually, and as the Surviving Spouse of Perry Keith Price, Deceased, Plaintiff/Appellant,**

v.

**Cathryn L. HOWARD, Cynthia Lynn Henning and Charles J. Howard, Jr., Independent Co–Executors of the Estate of Charles James Howard, M.D., Deceased; The Estate of Charles James Howard, M.D., Deceased; Cathy Ann Olsen, Independent Administratrix of the Estate of Jon Peter Olsen, Deceased; The Estate of Jon Peter Olsen, Deceased; David Hobza, and ServiCenter, Inc., Defendants/Appellees.**

No. 105,943.

Supreme Court of Oklahoma.

March 16, 2010.

As Corrected April 1 and June 14, 2010.

Rehearing Denied June 14, 2010.

Derek K. Burch, James A. Scimeca, Burch & George, P.C., Oklahoma City, OK, for Plaintiff/Appellant, Darla K. Price.

A. Thomas Elder, Jr., David C. Johnston, Smith Rhodes Stewart & Elder, P.L.L.C.,

Oklahoma City, OK, for Defendants/Appellees, Cathryn L. Howard, Cynthia Lynn Henning, and Charles J. Howard, Jr., The Estate of Charles James Howard, Cathy Ann Olsen, The Estate of Jon Peter Olsen.

Mark R. McPhail, Spradling, Kennedy & McPhail, L.L.P., Oklahoma City, OK, Galen Lee Brittingham, Andrew G. Wakeman, Atkinson, Haskins, Nellis, Brittingham, Gladd and Carwile, Tulsa, OK, for Defendants/Appellees, Cathryn L. Howard, Cynthia Lynn Henning and Charles J. Howard, Jr., The Estate of Charles James Howard.

Anton Rupert, Crowe & Dunlevy, Oklahoma City, OK, Katherine A. Staton, Jackson Walker, L.L.P., Dallas, TX, for Defendant/Appellee, David Hobza.

Bradley K. Donnell, Rodney K. Hunsinger, McAfee & Taft, Oklahoma City, OK, for Defendant/Appellee, ServiCenter, Inc.

WATT, J.:

¶1 We retained this cause to answer two questions: 1) whether the various defendants/appellees are entitled to the protection of the exclusive remedy provision[1] of the Oklahoma Workers' Compensation Act; and 2) if so, whether the actions of the respective parties were sufficient to take them outside

that protection under this Court's opinion in *Parret v. UNICCO Service Co.*, 2005 OK 54, 127 P.3d 572.

■ ¶2 The employee, ServiCenter's President, and a majority stockholder in the company were killed when the airplane crashed. There is no evidence that the pilot or any of the other passengers on the plane had any intention of harming themselves or others. Under these facts and assuming ServiCenter was aware that the airplane was carrying passengers in violation of its temporary flight restrictions,[2] that it was overweight, and that it took off in foul weather, the record does not demonstrate that the employer understood there was a substantial certainty of injury. Therefore, we determine that the evidence is insufficient under *Parret v. UNICCO Service Co.*, 2005 OK 54, 127 P.3d 572 to subject the employer to liability outside that provided by the Workers' Compensation Act. Nevertheless, material questions of fact exist as to whether the employer was engaged in a joint venture sufficient to extend the protections of Oklahoma's workers' compensation law to other members of the alleged agreement and to a third party claiming status as a co-employee under the Act.

---

1. Title 85 O.S. Supp.2005 § 12 providing in pertinent part:

   "The liability prescribed in Section 11 of this title shall be exclusive and in place of all other liability of the employer and any of his employees ... at common law or otherwise, for such injury, loss of services, or death, to the employee, or the spouse, personal representative, parents, or dependents of the employee, or any other person...."

2. Mrs. Price's contention that federal aviation regulations preempt Oklahoma's workers' compensation law is unconvincing. In *Craft v. Graebel–Oklahoma Movers, Inc.*, 2007 OK 79, 178 P.3d 170, we held that the Motor Vehicle Safety Act did not preempt the exclusive remedy provisions of Oklahoma's workers' compensation law. In so doing, we determined there was neither express nor implied preemption. Title 49 U.S.C. § 41713 (1997) prohibits states, political subdivisions, or political authorities of two or more states from enacting or enforcing a law, regulation, or other provision "having the force and effect of law related to a price, route, or service of an air carrier." Oklahoma's workers' compensation provisions do not relate to any of these three factors. Furthermore, even where a regu-

lation does relate to aviation safety, it may not necessarily be preempted by the Act. *Center for Bio–Ethical Reform, Inc. v. City & County of Honolulu*, 455 F.3d 910 (9th Cir.2006); *Sakar v. Hageland Aviation Servs., Inc.*, 609 F.Supp.2d 889 (D.Alaska 2008). Finally, the Fifth Circuit has determined that the Airline Deregulation Act does not preempt a claim for prohibiting retaliation for the bringing of a workers' compensation claim. *Anderson v. American Airlines, Inc.*, 2 F.3d 590 (5th Cir.1993). See also, *Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir.1996), rehearing and rehearing *en banc* denied (1996), *cert. denied*, 519 U.S. 823, 117 S.Ct. 81, 136 L.Ed.2d 39 (1996) [The Federal Aviation Act does not prohibit certain local ordinances even where they relate directly to the operation and landing of aircraft.]; *Monroe v. Cessna Aircraft Co.*, 417 F.Supp.2d 824 (E.D.Tex.2006) [Relatives' claims against a manufacturer for negligence and strict product liability are not impliedly prohibited by the Federal Aviation Act or federal aviation regulations.]; *Anderson v. Evergreen International Airlines*, 131 Or.App. 726, 886 P.2d 1068 (1994), review denied, 320 Or. 749, 891 P.2d 659 (1995) [Congress did not occupy field of aircraft operations and safety, so as to preclude state common-law wrongful discharge action against airline].

## FACTUAL AND PROCEDURAL HISTORY

¶3 On October 15, 2006, an airplane crash took the life of Perry Price (Price/employee). It is undisputed that: 1) Price was an employee of ServiCenter; and 2) on the day of the plane crash, he was going to the convention as a part of that employment at the request of Wayne Radco, ServiCenter's President.[3] Along with Price and Radko, Charles Howard, M.D. (Howard), a major stockholder in ServiCenter, and John Olsen (Olsen), Howard's son-in-law and the registered owner of the plane, also died in the crash. It is also undisputed that ServiCenter had done significant modifications to the plane. It is contended that the modifications and refurbishments, including the use of an improved experimental five-bladed propeller and the addition of slipper fuel tanks, arose from an agreement among Radco, on the behalf of ServiCenter, Howard, and Olsen to utilize the modified aircraft as a marketing tool to current and prospective customers of ServiCenter in an attempt to attract additional business.[4]

¶4 Mrs. Price filed suit in district court on May 29, 2007 naming as defendants the Howard and Olsen estates, and an individual, David Hobza. Price alleged that the individually named defendants' negligence was the proximate cause of her husband's death. The first amended petition was filed on June 21, 2007. Mrs. Price added ServiCenter as a defendant, claiming the employer was negligent in performing maintenance and in making repairs and modifications to the plane. Mrs. Price also contended that, when the maintenance, repairs, and modifications were made, ServiCenter had assumed a persona independent of its employer/employee relationship with her husband.[5]

¶5 On February 1, 2008, Hobza filed a motion for summary judgment. Hobza alleged that, when the plane crashed, he was an employee of the ServiCenter entitled to the same protections under the Workers' Compensation Act as his employer. Three days later, ServiCenter filed a similar motion

---

3. Videotaped Deposition of Darla Kay Price, January 4, 2008, Exhibit C to Defendant David Hobza's Motion and Brief for Summary Judgment, filed on February 1, 2008, providing in pertinent part at pp. 21–24:
   "... Q. All right. And did his job at The ServiCenter require him to travel?
   A. Like going to these conventions?
   Q. Yes.
   A. Yes....
   Q. All Right. And was he going to the convention as part of his employment with ServiCenter?
   A. Yes....
   Q. Do you recall who asked Perry to go on this October 2006—
   A. Wayne Radko...."

4. Videotaped Deposition of David E. Hobza, Jr., October 11, 2007, Exhibit 2 to Howard Defendants' and Olsen Defendants' Joint Motion for Summary Judgment and Supporting Brief, filed on February 5, 2008 and providing in pertinent part at pp. 92–93:
   "... Q. At what point, or when was the first time you had any discussion with anybody with regard to this plane obtaining an experimental certificate?
   A. That would have been early on in the program when the decision was made to do all the modifications to this airplane to make it a showpiece airplane and use for advertising of the ServiCenter, that would have been two or three months before.
   Q. And was that decision made by Jon Olsen?

   A. Made jointly by Jon Olsen and Dr. Howard and Wayne Radco...."

5. Price's dual capacity argument is unconvincing. Under the dual persona doctrine, an employer shielded from liability by the workers' compensation law exclusivity provision may still become liable to the employee if, when inflicting harm, the employer was acting in some different capacity based on whether the employer assumes a second persona which is completely and distinctly independent from its status as an employer. *Dyke v. Saint Francis Hosp., Inc.*, 1993 OK 114, ¶7, 861 P.2d 295. *Weber v. Armco, Inc.*, 1983 OK 53, 663 P.2d 1221 is instructive. The *Weber* Court held that an employer did not act in a dual capacity simply because it occupied the two-fold position of employer and manufacturer. Here, ServiCenter was in the business of selling airplane parts and making modifications to airplanes. We are not persuaded that it assumed a persona independent as that of an employer in making modifications to the Olsen aircraft, a business activity in which it regularly engaged. By this, we are not foreclosing application of the dual persona doctrine to Howard and Olsen in piloting the plane if, on remand, it is determined that they were Price's employer. The dual persona doctrine does not sanction multiple recovery through two remedies for the same harm. *Dyke v. Saint Francis, Hosp., Inc.*, this note supra.

claiming immunity from suit in district court pursuant to the exclusivity provision of the Workers' Compensation Act. Thereafter, the Howard and Olsen estates also sought summary judgment claiming that, at the time of the accident, ServiCenter, Howard, and Olsen were engaged in a joint venture to develop and market the modification/refurbishment package implemented on the plane. Howard and Olsen contended that, as joint venturers with ServiCenter, they were immune from suit under the exclusive remedy provisions of the Workers' Compensation Act.

¶ 6 After conducting an extensive hearing on April 11, 2008, the trial court entered judgment in favor of each of the defendants/appellees which was filed on May 9th. Price filed a timely appeal and requested that the cause be retained. The request was granted on August 22, 2008. Although the cause stood ready for assignment on that date, it was not received in these chambers until October 22, 2009.

## Standard of Review on Summary Judgment

■■■ ¶ 7 On summary judgment all inferences and conclusions to be drawn from the underlying facts contained in the record are to be considered in the light most favorable to the party opposing the motion.[6] Even when the basic facts are undisputed, motions for summary judgment should be denied, if, under the evidentiary materials, reasonable individuals could reach different factual con-

clusions.[7] The trial court granted summary judgment based on a legal determination that all the defendants/appellees were entitled to the protection of the exclusive remedy provision of the Workers' Compensation Act. The district court concluded it had no jurisdiction to proceed. Jurisdictional issues present questions of law[8] which this Court reviews *de novo.*[9]

## The limited exception provided under *Parret v. UNICCO Service Co.* to the exclusive remedy protections afforded to employers under the Workers' Compensation Act.

■■ ¶ 8 Regardless of fault, 85 O.S. Supp. 2006 § 11 of the Workers' Compensation Act places the duty upon employers to bear the responsibility for compensating employees for accidental personal injuries arising out of and in the course of employment.[10] Section 12 provides in pertinent part:

"The liability prescribed in Section 11 of this title shall be exclusive and in place of all other liability of the employer and any of his employees ... at common law or otherwise, for such injury, loss of services, or death, to the employee, or the spouse, personal representative, parents, or dependents of the employee, or any other person...."

The statutory language makes it clear that the Legislature intended that accidental injuries will fall within the confines of the Workers' Compensation Act and that an employer's liability for these injuries is exclusive under the Act.[11] Each of the defendants/ap-

---

6. *MLC Mort. Corp. v. Sun America Mort. Co.,* 2009 OK 37, fn. 14, 212 P.3d 1199; *Gaines v. Comanche County Medical Hosp.,* 2006 OK 39, ¶ 4, 143 P.3d 203, 24 A.L.R.6th 931; *Mitchell v. Cox,* 1997 OK 139, ¶ 7, 948 P.2d 317.

7. *Gaines v. Comanche County Medical Hosp.,* see note 6, supra; *Barnthouse v. City of Edmond,* 2003 OK 42, ¶ 36, 73 P.3d 840, *cert. denied,* 540 U.S. 981, 124 S.Ct. 464, 157 L.Ed.2d 371 (2003); *Carris v. John R. Thomas & Associates,* 1995 OK 33, ¶ 16, 896 P.2d 522.

8. *MLC Mort. Corp. v. Sun America Mort. Co.,* see note 6, supra; *Reeds v. Walker,* 2006 OK 43, ¶ 11, 157 P.3d 100.

9. *Welch v. Crow,* 2009 OK 20, ¶ 9, 206 P.3d 599; *Lowery v. Echostar Satellite Corp.,* 2007 OK 38,

¶ 11, 160 P.3d 959; *Pickens v. Tulsa Metropolitan Ministry,* 1997 OK 152, ¶ 7, 951 P.2d 1079.

10. Title 85 O.S. Supp.2006 § 11(A) providing in pertinent part:

"Every employer subject to the provisions of the Workers' Compensation Act shall pay, or provide as required by the Workers' Compensation Act, compensation according to the schedules of the Workers' Compensation Act for the disability or death of an employee resulting from an accidental personal injury sustained by the employee arising out of and in the course of employment, without regard to fault as a cause of such injury, and in the event of disability only ..."

11. *Davis v. CMS Continental Natural Gas, Inc.,* 2001 OK 33, ¶ 12, 23 P.3d 288.

pellees seeks protection from suit in district court under § 12's exclusive remedy provision.

¶ 9 Price invokes the intentional tort exception to workers' compensation liability as outlined by this Court in *Parret v. UNICCO Service Co.*, 2005 OK 54, 127 P.3d 572. The employee in *Parret* died as a result of injuries occurring when he was electrocuted while replacing emergency lights. We determined that tort liability could be imposed upon the employer if the injuries were the result of actions the employer knew were substantially certain to cause injury.

¶ 10 Before tort liability may be imposed under *Parret's* substantial certainty test, the employer's conduct must amount to an intentional tort; and, the employer must have: 1) desired to bring about the worker's injury; or 2) acted with the knowledge that such injury was substantially certain to result from the employer's conduct. To remove the injured worker's claim from the exclusive remedy provision of the Workers' Compensation Act and allow the worker to proceed in district court, **nothing short of a demonstration of the employer's knowledge of the substantial certainty of injury will suffice.** The employer's cognizance of a foreseeable risk, high probability, or substantial likelihood of injury are insufficient to impose tort liability.

¶ 11 **a) THE RECORD IS DEVOID OF ANY EVIDENCE THAT THE SERVI-CENTER/EMPLOYER BELIEVED THAT THE PLANE ON WHICH THE EMPLOYEE WAS TRANSPORTED WAS SUBSTANTIALLY CERTAIN TO CRASH.**

¶ 12 Mrs. Price contends that it was error to grant summary judgment to Servi-Center on multiple grounds. She does not assert that the employer desired to bring about her husband's injury. Nevertheless, she does argue that ServiCenter had information sufficient to fall within the second exception to the exclusive remedy provision of the Workers' Compensation Act outlined under *Parret.* The wife asserts that a question of fact exists as to whether ServiCenter was substantially certain that her husband would be injured while in flight.

¶ 13 ServiCenter, as Price's employer, claims the protection of the Act's exclusive remedy provision, 85 O.S. Supp.2005 § 12.[12] The employer contends that no one could reasonably determine that it wanted to see its President, a major stockholder, or Price die in a crash or that it was substantially certain that the crash was likely. We agree with ServiCenter's contentions.

¶ 14 The employee was given the assignment to travel on the plane on company business and was accompanied on the trip by ServiCenter's President, Wayne Radco (Radco).[13] Radco both directed Price to fly to Florida on the plane and also died in the same crash. Earlier, aircraft fitted with the experimental five-bladed propellers had traveled successfully to remote convention locations.[14] The airplane had flown some twenty

---

**12.** Title 85 O.S. Supp.2005 § 12, see note 1, supra.

**13.** Videotaped Deposition of Darla Kae Price, January 4, 2008, Exhibit C to Defendant David Hobza's Motion & Brief for Summary Judgment, providing in part at p. 92:

"... Q Do you recall who asked Perry to go on this October 2006—
A Wayne Radco...."

**14.** Videotaped Deposition of Russell Allen Hampton, March 25, 2008, Exhibit A to Plaintiff's Combined Supplemental Objection to the Motions for Summary Judgment of the Defendants, David Hobza, the ServiCenter, Inc., the Howard

Defendants and the Olsen Defendants, filed April 3, 2008, providing in pertinent part at p. 50:

"Q (By Mr. Burch) Well, it's the first time it happened, that you—you knew of?
A Right. Well, we've flown airplanes to these places before. They had did it in 2000—2001 or '99 or something. They—they had an airplane that they put the five-blade props on and flew to NBAA.
I couldn't tell you who went or anything, I—I just know that, you know, they had gone to NBAA before.
Q With—they had flown to an NBAA convention with—
A With a five-blade prop before...."

to thirty hours while fitted with the experimental five-bladed propellers without incident. It had also been airborne with representatives from the company through which ServiCenter hoped to market the propellers.[15] Nevertheless, the plane had not flown with the additional tanks fueled.[16]

¶ 15 There is evidence that David Hobza (Hobza), a defendant/appellee, had knowledge that the plane was approximately one thousand (1,000) pounds too heavy at takeoff and that he passed that information along to the plane's pilot. Testimony indicated that takeoff during a rainstorm and the overweight condition of the plane "substantially increased the likelihood that complications could occur." [17] It also appears that Hobza was aware that Price should not have been included as a passenger pursuant to restrictions imposed on the aircraft under its experimental operating limitations.[18] At a management meeting following the crash, Hobza was: accused of being reckless in allowing the plane's take-off; told he should have done anything necessary to have stopped the flight; and terminated.[19] Hobza was rehired at a stockholders' meeting in February, 2007.

**15.** Videotaped Deposition of David B. Hobza, Jr., October 11, 2007, Exhibit D to Defendant David Hobza's Motion & Brief for Summary Judgment, providing in pertinent part at p. 110:

"... Q Where the plane flew for 20 to 30 hours.
A Uh-huh.
Q With these MT five-bladed props on it.
A Okay.
Q That 20 to 30 hours, do you know how—over what period of time those 20 to 30 hours were flown?
A No, I don't. I would—I would imagine, and I would be purely speculating, but I would imagine it was over a reasonably short period of time, couple of months, three months, something like that. I know one—one time the—the people from Twin Commander, they were very interested in working with us on the project because they wanted the product to be marketable through the Twin Commander organization. And they came down, brought their engineering people down and the airplane was flown for them just to—so they could experience—measure the noise level difference in the airplane...."

**16.** Videotaped Deposition of Russell Allen Hampton, March 25, 2008, Exhibit A to Plaintiff's Combined Supplemental Objection to the Motions for Summary Judgment of the Defendants, David Hobza, the ServiCenter, Inc., the Howard Defendants and the Olsen Defendants, filed April 3, 2008, providing in pertinent part at p. 82:

"... Q Okay. Certainly, we know that prior to October 15th, 2006, 55JS had never been flown with full primary tanks, as well as full slipper tanks, correct?
A Correct. It had never been flown like that...."

**17.** Videotaped Deposition of Russell Allen Hampton, March 25, 2008, Exhibit A to Plaintiff's Combined Supplemental Objection to the Motions for Summary Judgment of the Defendants, David Hobza, the ServiCenter, Inc., the Howard Defendants and the Olsen Defendants, filed April 3, 2008, providing in pertinent part at p. 88:

"... Q ... You would agree with me that, because this plane took off in the overweight condition it was in, flying in a rainstorm, on October 15th, that substantially increased the likelihood that complications could occur in the flight of this airplane?
... A Yes...."

**18.** Videotaped Deposition of David B. Hobza, Jr., October 11, 2007, Exhibit D to Defendant David Hobza's Motion & Brief for Summary Judgment filed on February 1, 2008, providing in pertinent part at pp. 186–87:

"... Q Now, we've got Plaintiff's Exhibit 14, which I believe is attached as well, and it's entitled—it's a three-page document, SCI 0770 through 0772, and it is entitled Experimental Operating Limitations. Have you seen Exhibit 14 before?
A Yes, I have seen it.
Q Do you see on Page 2 of the Exhibit the operating limitations specifically says that no person may be carried in this aircraft during flight unless that person is essential to the purpose of the flight. Do you see that?
... A Uh-huh, I see it.
Q Was Perry Price essential to the purpose of the flight on October 15th, 2006?
A I'd say he probably wasn't essential...."

**19.** Videotaped Deposition of Donald Lawrence Mayer, November 19, 2007, Exhibit F to Defendant David Hobza's Motion & Brief for Summary Judgment filed on February 1, 2008, providing in pertinent part at pp. 122–24:

"... Q All right. Mr. Hobza has testified about it. You have said you didn't read his deposition, and what I would like for you to do is tell me about the meeting, why you called it, and what happened in it.
A ... And I let my emotions get away from me, and I went—I went after David in—in an accusatory fashion, with respect to having this airplane depart under the conditions and circumstances that I had been told existed during the course of the preceding week.
I—I'm not sure if I gave him much of an opportunity to explain or present things from

¶ 16 There is nothing in the record indicating that Radco, ServiCenter's President and Price's supervisor, was ever advised that there were facts indicating the flight would not be safe. Even if we were to impute actual knowledge to ServiCenter,[20] the record is devoid of evidence that any of the parties who occupied the plane that day appreciated the risk or were intent on committing suicide by boarding the plane for take-off. Undoubtedly, the employer's conduct in allowing the plane to take flight may have been reckless. Nevertheless, absent some evidence of impaired judgment, none of which exists here, we do not expect individuals to engage in self-destructive behavior.[21] Furthermore, violation of government safety regulations, even if wilful and knowing, does not rise to the level of an intentional tort [22] or an actual intent to injure.[23]

¶ 17 Establishing that an employer has acted in a manner resulting in an employee's injuries being substantially certain presents a formidable barrier to recovery in tort.[24] Under the facts presented, we cannot say that the employer's conduct amounted to an intentional tort or that the employer desired to bring about the worker's injury or acted with the knowledge that such injury was substantially certain to result from the employer's conduct. Therefore, we hold that the evidence is insufficient under *Parret v. UNICCO Service Co.*, 2005 OK 54, 127 P.3d 572 to subject the employer to liability outside that provided by the Workers' Compensation Act.

¶ 18 **b) THE EVIDENCE PRESENTS A QUESTION OF FACT AS TO WHETHER THE SERVICENTER, HOWARD [A MAJORITY STOCKHOLDER], AND OLSEN [THE PLANE'S OWNER], WERE ENGAGED IN A JOINT VENTURE SUFFICIENT TO ENTITLE THE STOCKHOLDER AND THE OWNER TO THE PROTECTIONS OF THE EXCLUSIVE REMEDY PROVISIONS OF THE WORKERS' COMPENSATION ACT.**

¶ 19 Mrs. Price contends that her husband died as a result of Howard's and Olsen's negligence in piloting the plane and in failing to adhere to the aircraft's design and experimental operating limitations. She also asserts that there is no evidence of an agreement among the ServiCenter, Howard, and Olsen arising to that of a joint venture. Therefore, Price argues there is no basis upon which to extend the protection of the exclusive remedy provisions of the Workers' Compensation Act to either Howard or Olsen.

¶ 20 In contrast, Howard and Olsen argue that they, along with ServiCenter, were involved in a joint venture for the purpose of developing and marketing the five-bladed propellers, interior modifications, and other improvements. As members of a joint venture with the employer, Howard and Olsen claim the protection of the exclusive remedy provisions of the Workers' Compensation Act.

### The nature of a joint venture.

¶ 21 A joint adventure is a special combination of two or more persons where,

his point of view, but I then—as the only living corporate officer of the Servicenter, I terminated his contract and put it into a 12–month runoff period, and David left and the meeting folded up fairly shortly after that.
Q Do you recall what you told David Hobza?
A Yeah I was pretty emotional about it, and I told him I thought he should have done anything and—anything and everything he physically or verbally knew how to do to avoid having the aircraft depart.
Q Anything else?
A At the time, under the emotional stress, I think I accused him of being reckless ..."

20. See, *Patrick's Inc. v. Mosseriano*, 1955 OK 350, ¶ 0, 292 P.2d 1003; *Oklahoma Gas & Elec. Co. v. Oliphant*, 1935 OK 1225, ¶ 0, 45 P.2d 1077.

21. *Ex parte Essary*, 992 So.2d 5 (Ala.2007).

22. *Williams v. Mammoth of Alaska, Inc.*, 890 P.2d 581, 584 (Alaska 1995).

23. *Mize v. Conagra, Inc.*, 734 S.W.2d 334–35 (Tenn.App.1987).

24. *Davis v. Continental Natural Gas, Inc.*, see note 11 at ¶ 14, supra.

in some specific venture, a profit is jointly sought without any partnership or corporate designation; and, by special agreement, the parties may limit their respective profits and provide which particular part of the expenses each should bear before participation in any profit.[25] Corporations have the power to enter into joint ventures with individuals.[26] An employee engaged in the activities of a joint venture is an employee of each of the joint venturers.[27]

■■■■■ ¶ 22 While the chief characteristic of a joint venture is the seeking of joint profits from a transaction,[28] no single factor is sufficient to establish that parties are engaged in a joint venture. Three requisite elements exist. They are: 1) a joint interest in property; 2) an express or implied agreement to share profits and losses of the venture; and 3) action or conduct showing cooperation in the project.[29] The existence of a joint venture presents a question of fact.[30]

25. *Sand Springs Home v. Dail,* 1940 OK 279, ¶ 0, 103 P.2d 524. See also, *Commercial Lumber Co. v. Nelson,* 1937 OK 607, ¶ 0, 72 P.2d 829.

26. *Sand Springs Home v. Dail,* see note 25, supra; *Municipal Paving Co. v. Herring,* 1915 OK 1115, 150 P. 1067.

27. *Mendonca Dairy v. Mauldin,* 1966 OK 233, ¶ 9, 420 P.2d 552; *Johnston Grain Co. v. Self,* 1959 OK 169, ¶ 0, 344 P.2d 653.

28. *Commercial Lumber Co. v. Nelson,* see note 25, supra.

29. *Sperling v. Marler,* 1998 OK 81, ¶ 21, 963 P.2d 577; *Martin v. Chapel, Wilkinson, Riggs, & Abney,* 1981 OK 134, ¶ 11, 637 P.2d 81.

30. *Sperling v. Marler,* see note 29, supra; *Central Plains Constr. v. Hickson,* 1998 OK CIV APP 83, ¶ 12, 959 P.2d 998.

31. A supplemental type certificate is a document issued by the Federal Aviation Administration that approves a modification to the aircraft and certifies that, with the modification, the aircraft is airworthy. Title 49 U.S.C. § 44704 (2005)(b) providing in pertinent part:

"**Supplemental type certificates—**
(1) **Issuance.**—The Administrator may issue a type certificate designated as a supplemental type certificate for a change to an aircraft, aircraft engine, propeller, or appliance.

**Disputed material facts.**

■■■ ¶ 23 Both Howard and Olsen died in the crash along with Price's husband. Howard was an officer and director of ServiCenter, owning approximately forty-nine percent (49%) of the stock in the company. Howard purchased the aircraft from ServiCenter in 2005. His son-in-law, Olsen, was the plane's registered owner. Howard and Olsen assert that they, along with ServiCenter, agreed to cooperate in obtaining a supplemental type certificate (STC)[31] for the five-bladed propellers to promote sales through the company. They also insist that Radco, ServiCenter's President, agreed that modifications such as the propellers, the addition of slipper tanks, and other modifications would be incorporated into Olsen's plane for purposes of demonstrating their utility to potential customers. Under the alleged agreement, Howard paid for the parts installed on the airplane; ServiCenter stood the expense of the labor; and, Olsen received the benefit of an upgraded craft for allowing ServiCenter to utilize it to promote sales.[32] Presumably, the employer

(2) **Contents.**—A supplemental type certificate issued under paragraph (1) shall consist of the change to the aircraft, aircraft engine, propeller, or appliance with respect to the previously issued type certificate for the aircraft, aircraft engine, propeller, or appliance.
(3) **Requirement.**—If the holder of a supplemental type certificate agrees to permit another person to use the certificate to modify an aircraft, aircraft engine, propeller, or appliance, the holder shall provide the other person with written evidence, in a form acceptable to the Administrator, of that agreement. A person may change an aircraft, aircraft engine, propeller, or appliance based on a supplemental type certificate only if the person requesting the change is the holder of the supplemental type certificate or has permission from the holder to make the change." [Emphasis in original.]

32. Videotaped Deposition of David E. Hobza, Jr., October 11, 2007, Exhibit 2 to Howard Defendants' & Olsen Defendants' Joint Motion for Summary Judgement & Supporting Brief providing in pertinent part at pp. 92–94:

"... Q. At what point, or when was the first time you had any discussion with anybody with regard to this plane obtaining an experimental certificate?
A. That would have been early on in the program when the decision was made to do all the modifications to this airplane to make it a showpiece airplane and use for advertising of

was to benefit from the arrangement by utilizing the aircraft as a demonstration piece for the exclusive rights to sell the five-bladed propellers [33] and the stockholder would enjoy the increase in profits from his holdings in the company.

¶ 24 Although Hobza testified that Howard, in association with the joint venture, would pay only for parts, there is some indication in the record that at least a portion of the modifications made to the plane may not have been included within that agreement and were paid for by Howard, personally.[34]

> the ServiCenter, that would have been two or three months before.
> Q. And was that decision made by Jon Olsen?
> A. Made jointly by Jon Olsen and Dr. Howard and Wayne Radco.
> Q. To your knowledge, sitting here today, what interest did Jon Olsen have in having all of these modifications made to his airplane?
> A. The arrangement that had been made that I sat in on with Dr. Howard and with Wayne Radco was in lieu of spending a lot of money on advertising, they had a—an agreement that they were going to do certain things to this airplane to make it a flying advertisement for the ServiCenter, and on certain items on that airplane Dr. Howard agreed that he would pay for the material and the ServiCenter would provide the labor to install these particular parts and do these modifications. And in the course of doing that, the propellers were going to have to—were going to cause the airplane to be required to be put in an experimental condition to be flown and utilized. . . ."

**33.** Videotaped Deposition of David E. Hobza, Jr., October 11, 2007, Exhibit 2 to Howard Defendants' & Olsen Defendants' Joint Motion for Summary Judgment & Supporting Brief providing in pertinent part at p. 111:

> ". . . Q. So what was the benefit to the ServiCenter with these props?
> A. Because the ServiCenter would—with only initial STC, they would buy the props directly from MT Propeller, they would market [sic] the prop up and then they would sell them to the ServiCenter network and they would mark them up again before the end user got them. . . ."

**34.** Videotaped Deposition of David E. Hobza, Jr., Exhibit 2 to Howard Defendants' & Olsen Defendants' Joint Motion for Summary Judgment & Supporting Brief, filed on February 5, 2006 providing in pertinent part at p. 168:

> ". . . Q. He says', [sic] Dave Hobza has reviewed the invoice and asked me to send it to you for payment. If you have any questions

Additionally, the record also indicates that ServiCenter, which was to be responsible for only the labor, made at least a $20,000.00 deposit on the propellers installed on the aircraft.[35] Furthermore, a board member testified that it was understood that: Hobza had been directed to sell the project involving the experimental propellers; that he was surprised to discover that there had been a renewed effort to market them through the ServiCenter; the project proceeded without his approval; and, he was unaware of any separate entity formed involving the ServiCenter to pursue the propeller project.[36] Fi-

> about the invoice, please contact Dave Hobza.'
> He says, 'Generally, I work through the ServiCenter on these projects, however, Charles and Dave wanted to keep this job separate.' is that accurate?
> A. I don't know why he would use that kind of verbiage. Charles contracted with him directly, so it wasn't going through the ServiCenter because the ServiCenter wasn't going to pay for it. . . ."

**35.** Videotaped Deposition of David E. Hobza, Jr., Exhibit 3 to Howard Defendants' & Olsen Defendants' Joint Motion for Summary Judgment & Supporting Brief, filed on February 5, 2006 providing in pertinent part at p. 374:

> ". . . Q. Do you know if that cost of $20,000 for the propellers was ever billed to Dr. Howard?
> A. I don't think it was. Again, this was a—this was basically a deposit for the propellers and also a slot to—to start the STC program after the first part of the year in Deland, Florida, with the MT Propellers. They felt they could get the STC much simpler and quicker and easier because that's what they do every day. . . ."

**36.** Videotaped Deposition of Donald Lawrence Mayer, Plaintiff's Exhibit A attached to the Plaintiff's Objection to Howard & Olsen's Motion for Summary Judgment, filed on March 19, 2008, providing in pertinent part at:

> p. 58 ". . . Q All right. Before we broke, we were talking about this MT Propeller project, and as I recall—or just to kind of summarize where we are, in January of 2005, you had voiced objection to continuing with the project, it wasn't going anywhere, and you had directed Mr. Hobza to do whatever he could to try to market the project or sell it to Twin Commander; right?
> . . . A We agreed, as a group of stockholders, that David would take on that initiative to sell the project. I didn't direct him. . . ."
> p. 73 ". . . Q Well, when—when you found out that there was a renewed effort, both financial-

nally, the decision to proceed with the venture was made without consultation of the entire ServiCenter Board. Nevertheless, Radco had apparent authority to enter such an agreement with Howard and Olsen.[37]

¶ 25 Howard and Olsen assert the agreement exists while Price argues that there is no evidence of any contract. The evidence involving the alleged agreement is contradictory. It is not for this Court to determine the efficacy of material facts. However, we are charged with looking at those facts in the light most favorable to Price.[38] There is disputed evidence of: the existence or the nature of any agreement among ServiCenter, Howard, and Olsen; whether, if an agreement existed, the parties' actions fell within the contract; and, whether ServiCenter's President had the authority to bind its principle to a marketing stratagem involving the modifications made to the aircraft. The evidence of a joint venture is contradictory.

ly and with—with personnel from the Servicenter to—to initiate the project and to participate once again in the MT Propeller project, how did that affect you?

A Well, I was never aware of any terms and conditions associated with either the pursuit of modifying an airplane to put it into a configuration to have five-bladed props on it or any proposed arrangements with respect to what the economic benefits of having that kind of a project be [sic] pursued were going to be...."

p. 75–76 "... Q (By Mr. Burch) If Servicenter employees and personnel were used to renew the project and to work on the project, make modifications to this airplane, it was certainly done without your approval; is that right? ... THE WITNESS: Yes....

Q (By Mr. Burch) To your knowledge, was there some separate—I'm not sure what the right word is, but—but some separate enterprise or some separate entity that was pursing this MT Propeller STC, other than the Servicenter?"

A Not to my knowledge...."

**37.** Videotaped Deposition of Donald Lawrence Mayer, November 19, 2007, Exhibit 8 to Howard Defendants' & Olsen Defendants' Joint Reply to Plaintiff's Objection to Motion for Summary Judgment filed April 4, 2008, providing in pertinent part at:

pp. 168–70 "... Q And Mr. Radko had the authority to enter into agreements that he deemed appropriate for the ServiCenter?
A He did.
Q Do you know of any reason that Mr. Radko would have not had the authority to enter into

Therefore, we hold that this cause presents issues of material fact precluding an award of summary judgment entitling Howard and Olsen to the exclusive remedy protections of the Workers' Compensation Act.

¶ 26 **c) MATERIAL ISSUES OF FACT EXIST AS TO WHETHER HOBZA WAS PRICE'S CO-EMPLOYEE ENTITLED TO THE PROTECTIONS AFFORDED BY THE EXCLUSIVE REMEDY PROVISIONS OF THE WORKERS' COMPENSATION ACT.**

■ ¶ 27 Mrs. Price argues that Hobza, the individual providing information to the pilot about the overweight condition of the aircraft on the day of the crash, was not a co-employee of her husband but an independent contractor associated with the ServiCenter. As such, she contends Hobza is not entitled to the limited liability protections of the Workers' Compensation Act. Conversely,

an agreement with Dr. Olsen or—excuse me, Dr. Howard or Mr. Olsen to pursue the five-bladed prop STC?
A No, I don't.
Q Mr. Radko had the authority to enter into joint ventures that he deemed appropriate for the ServiCenter business?
... THE WITNESS: Yeah. I guess—I guess—I'm having trouble with the reference to joint ventures, because if it rose to the level of, you know, kind of a joint venture with, arguably, some kind of entity, I would think that would come under the—at least good corporate practice of reference to the board of directors and—and some consideration by the full board.
Q (By Mr. Elder) But that was never brought to your attention; correct?
A Certainly to enter an agreement. The thing I'm having trouble with is the characterization as a joint venture...."

at pp. 193 "... Q Okay. Was Wayne Radko authorized to engage in those types of negotiations for the Servicenter?
A Not with any specificity, but, certainly, a—a cost-sharing arrangement in connection with an aircraft modification project of the kind that the Servicenter was equipped with the resources to perform, I would have to say that I would expect that the authority of the chief executive officer of the Servicenter would include negotiating and—and concluding a contractual arrangement of that matter...."

**38.** *MLC Mort. Corp. v. Sun America Mort. Co.*, see note 6, supra; *Gaines v. Comanche County Medical Hosp.*, see note 6, supra; *Mitchell v. Cox*, see note 6, supra.

Hobza insists that he is a long time Servi-Center employee entitled to the same protections under the Workers' Compensation Act as his employer.[39]

### Disputed material facts.

¶ 28 Mayer, held a forty-nine percent (49%) interest in the ServiCenter and prepared the agreement defining the arrangement between the employer and Hobza. The agreement is entitled "Contractor Agreement between the ServiCenter, Inc. And David Hobza" providing in the first paragraph that the document is to serve as "the Contractor agreement ... between (the 'Contractor')

39. Videotaped Deposition of David B. Hobza, Jr., October 11, 2007, Exhibit D to Defendant David Hobza's Motion & Brief for Summary Judgment, filed on April 4, 2008, providing in pertinent part at pp. 27–28:

"... Q At some point, did your position change from being the president when you first went in with the Service Company to another position?
A Yes.
Q Take me through that.
A After two or three years, the general consensus was that we could—that we should have a different president of the company and that we had a young man that was working with us, and we put him in the position of the president of the company and I became an employee working as a—as basically a salesman and—coordinator with—as a salesman, coordinated with customers for services that the ServiCenter provided...."

40. Videotaped Deposition of Donald Lawrence Mayer, November 19, 2007, Exhibit K to Defendant David Hobza's Reply to Plaintiff's Response to Hobza's Motion for Summary Judgment filed on April 4, 2008 providing in pertinent part at pp. 175–77:

"... Q On the date of the—the takeoff and the crash, is it fair to say that one capacity of David Hobza was as an employee of the Servicenter?
A Well, the document and the agreement defined the relationship with—between Servicenter and David as styled and as at least was intended by the drafter to establish David as a contractor.
And I say that from firsthand experience and knowledge, because I wrote it and I signed it on behalf of the Servicenter.
On the other hand, I'm also aware of additional indicia, materials and evidence, that could lead a reasonable person to conclude that David was operating in the capacity as an employee on at least October 15th, 2006.
Q And those additional indicia would be, for example?

and the Servicenter, Inc...". Mayer testified that the intent of the agreement was for Hobza to act as a contractor for ServiCenter rather than to be considered an employee.[40] When Mayer was asked how Hobza should be characterized on the date of the crash, he indicated that Hobza could be described as a member of the Board of Directors of the ServiCenter, as their contractor, and as an agent for Jon Olsen.[41] This testimony is supported by a document in the record giving Hobza the authority to act as Olsen's agent to change, modify, and or place the aircraft in the experimental category.[42] Despite his statements that ServiCenter, in exe-

A Well, one of the ones that come to mind is the use of a W–2 form to report to him earnings for the preceding fiscal year of the corporation.
Q When you have—when you get a W–2, its very difficult to ever contend that you're actually an independent contractor and not an employee; is that fair?
A That's absolutely fair.
Q And here, with the W–2, we know Servicenter was—was paying Mr. Hobza a salary, right.
A Correct.
Q And they were withholding taxes?
A That's correct.
Q Including, for example, Social Security taxes?
A That's correct, also.
Q And your knowledge of this are is [sic] that that means employee, doesn't it?
... THE WITNESS: There is—there is considerable legal precedent, I believe, to draw that conclusion from that information...."

41. Videotaped Deposition of Donald Lawrence Mayer, November 19, 2007, Exhibit 4 to Howard Defendants' and Olsen Defendants' Joint Motion for Summary Judgment & Supporting Brief, filed on February 8, 2008 providing in pertinent part at p. 109:

"... Q On October 15th, 2006, what was David Hobza's position with the Servicenter?
A He was an owner, and he was a member of the board of directors of the Servicenter.
He was acting as an agent for Jon Olsen, the owner of the airplane, to affect the modification and recertification of the airplane in the experimental category, and he was working under the auspices of a contractor agreement between himself and the Servicenter...."

42. Exhibit 7 to Howard Defendants & Olsen Defendants' Joint Motion for Summary Judgment & Supporting Brief, filed on February 8, 2008, dated September 21, 2006, and addressed to "whom it may concern" is signed by Jon P. Olsen/owner and providing:

cuting the agreement with Hobza, intended that the relationship be that of independent contractor, he also testified that there were other indicators that the agreement might be construed to be that of employer-employee.[43]

¶ 29 Generally, the question of whether an individual serves as an independent contractor or an employee is for the trier of fact.[44] The issue becomes a one of law when no other inference can be drawn from the facts presented other than that the individual serves in the capacity of one or the other.[45] The facts here are highly contested. Reasonable people could differ in their implications. Therefore, we hold that this cause presents issues of material fact precluding an award of summary judgment entitling Hobza to the exclusive remedy protections of the Workers' Compensation Act.

## CONCLUSION

¶ 30 On the day of the crash, the flight conditions were not optimum, the plane was flying with more weight than was advisable, and the flight took place in violation of standards set forth in its experimental certificate. Nevertheless, there is nothing in the record to demonstrate that the employer was substantially certain that its employee would be injured. Therefore, the evidence is insufficient under *Parret v. UNICCO Service Co.*, 2005 OK 54, 127 P.3d 572 to subject the employer to liability outside that provided by the Workers' Compensation Act. However, there are disputed facts which must be re-

solved by the trier of fact regarding both the existence of a joint venture and the status of employee versus independent contractor. Therefore, we reverse the cause and remand it for proceedings consistent with the provisions of this opinion.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

EDMONDSON, C.J., TAYLOR, V.C.J., HARGRAVE, KAUGER, WATT, WINCHESTER, COLBERT, REIF, JJ., concur.

OPALA, J., concurring in part.

OPALA, J., concurring in part

¶ 1 Because I did not join the court's pronouncement in *Parret v. UNICCO Service Co.*, 2005 OK 54, 127 P.3d 572, I cannot concur in today's entire opinion. Insofar as the court appears to extend to some appellees full protection of the Workers' Compensation Act's exclusive remedy found in 85 O.S. Supp.2005 § 12, by exonerating them from all tort liability at common law, I concur. But I am compelled to recede from all other parts of the court's holding.

"As Owner of Aero–Commander N55JS S/N11195. [sic] Give Mr. David Hobza the authority to act as agent for me, to change, modify and or place this aircraft in the experimental category."

**43.** See note 37, supra. In *Page v. Hardy*, see note 44 at ¶ 10, infra, the Court addressed the distinction between employees and independent contractors by considering the following factors: 1) the nature of the contract between the parties, whether written or oral; 2) the degree of control which, by the agreement, the employer may exercise on the details of the work or the independence enjoyed by the contractor or agent; 3) whether or not the one employed is engaged in a distinct occupation or business and whether he carries on such occupation or business for others; 4) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a

specialist without supervision; 5) the skill required in the particular occupation; 6) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; 7) the length of time for which the person is employed; 8) the method of payment, whether by the time or by the job; 9) whether or not the work is part of the regular business of the employer; 10) whether or not the parties believe they are creating the relationship of master and servant; and 11) the right of either to terminate the relationship without liability.

**44.** *Page v. Hardy*, 1958 OK 283, ¶ 0, 334 P.2d 782; *Harris Meat & Produce Co. v. Brown*, 1936 OK 460, ¶ 0, 59 P.2d 280; *Shepard v. Crumby*, 1930 OK 549, ¶ 0, 293 P. 1049.

**45.** *Harris Meat & Produce Co. v. Brown*, see note 44, supra; *Maryland Casualty Co. v. State Indus. Com'n*, 1931 OK 155, ¶ 3, 298 P. 275.